**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Case No. 11-cv-01907-RM-KMT

ELECTROLOGY LABORATORY, INC., d/b/a ROCKY MOUNTAIN LASER COLLEGE, a
Colorado corporation,

      Plaintiff,

v.

LARRY PAUL KUNZE a/k/a LORENZO KUNZE and LORENZO BLACKSTONE KUNZE,
M.E., d/b/a AMERICAN LASER COLLEGE and THE LASER COLLEGE, and
LARRY PAUL KUNZE, JR., a/k/a LORENZO KUNZE JR.,

      Defendants and Third-Party Plaintiffs,

v.

RAY FLUKEN,
JODY RIGGS FLUKEN, and
JESSICA RIGGS,

      Third-Party Defendants.

---

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER**

---

Defendant Larry Paul Kunze a/k/a Lorenzo Kunze[1] sold his "family" business (Plaintiff

Electrology Laboratory, Inc. ("ELI"), d/b/a ROCKY MOUNTAIN LASER COLLEGE

("RMLC")) but couldn't give it up.  So, as the evidence revealed, even while negotiating the sale

of ELI to the purchasers (Third-Party Defendants Ray Fluken, Jody Riggs Fluken, and Jessica

Riggs, collectively, the "Fluken-Riggs"), Mr. Kunze was trying to figure out how to continue the

same business he was selling.  The purchasers of the business took exception to Mr. Kunze's

actions, and rightly so.  The Fluken-Riggs and ELI (collectively, "Plaintiffs") brought this action

---

[1] Mr. Kunze is also known as "Lo."

seeking to recover damages caused by the actions of Mr. Kunze and his son, Defendant Larry Paul Kunze, Jr. ("Mr. Kunze, Jr.") (Mr. Kunze and Mr. Kunze, Jr., collectively, "Defendants"). In response, Mr. Kunze filed counterclaims and third-party claims asserting it is Plaintiffs who are at fault. The Fluken-Riggs returned with third-party counterclaims against Mr. Kunze. After examining the evidence, considering the parties' stipulations (including the stipulations dismissing certain claims), evaluating the credibility of the witnesses, and analyzing the law, and being otherwise fully advised, the Court finds relief is warranted – to both sides. The Court finds in favor of Plaintiffs, in whole or in part, on eight of their 11 claims for relief. The Court finds Mr. Kunze's credibility sorely lacking and is unpersuaded by his testimony, but nonetheless finds he is entitled to relief on his counterclaim and third-party claim for breach of the Promissory Note given in partial payment for the purchase of ELI. The Court's rationale is as follows.

## I.      FINDINGS OF FACT

To the extent that any conclusions of law are deemed to be findings of fact, they are incorporated herein by reference as findings of fact.

### A.  Background

1.      ELI is a Colorado corporation with its principal place of business at 651 Garrison St., Suite 200, Lakewood, Colorado. ELI does business as "ROCKY MOUNTAIN LASER COLLEGE" and RMLC, and operates on a fiscal year which runs from February 1st to January 31st.

2.      Mr. Kunze is a Colorado citizen who, during the relevant time period, resided at 16545 W. Bayaud Dr., Golden, Colorado, less than 10 miles from ELI. Mr. Kunze operated ELI

in its current form since at least the 1990s.  Mr. Kunze was the sole shareholder of ELI until he sold it to the Fluken-Riggs.  ELI was, essentially, a family business.

3.      In addition to owning and operating ELI, Mr. Kunze also did business under the name "American Laser College."

4.      Mr. Kunze, Jr. is Mr. Kunze's son and, during the relevant time period, also a Colorado citizen and resident.  Mr. Kunze, Jr. worked for ELI under his father's ownership and briefly thereafter.

5.      Ray Fluken and Jody Riggs Fluken are husband and wife, and Colorado citizens. Jessica Riggs, also a Colorado citizen, is Mrs. Fluken's daughter and Mr. Fluken's stepdaughter.

**B.  ELI – Prior to Mr. Kunze's sale to the Fluken-Riggs**

6.      Under the ownership of Mr. Kunze, ELI earned income primarily from three sources – its occupational school, its clinic, and the sale of laser equipment.

(i)      Through its occupational school known as "ROCKY MOUNTAIN LASER COLLEGE" and RMLC, ELI provided aesthetic laser use education and training to students not only onsite at its Lakewood facility[2] but also offsite in other states;

(ii)     Through its clinic, ELI provided aesthetic laser services to clients; and

(iii)    Through its former and current students, ELI earned income from the sale of laser equipment.

7.      ELI's laser education course consisted of 40 hours of training through a curriculum approved and regulated by the Colorado Department of Higher Education, Division of Private Occupational Schools ("DPOS").  ELI's students received RMLC written materials and hands-on training on laser equipment in the course taught by Mr. Kunze.

---

[2] The parties sometimes referred to ELI's location as the "Denver facility."

8.      In order to market classes and sell laser equipment, ELI maintained a customer list, identifying students who took the RMLC laser education course.  The list changed over time to reflect additional enrollments.  The student information was exchanged only between students within class, not to other classes and their students.  ELI did maintain some precautions in keeping its student information confidential, such as keeping the files under lock and key and keeping the lists password protected on the computer system.

9.      Sometime in the 1990s, ELI began awarding its students "Certified Laser Specialist" or "CLS" certificates, showing they were trained at ROCKY MOUNTAIN LASER COLLEGE.

10.     In connection with its business, ELI has long used the marks "ROCKY MOUNTAIN LASER COLLEGE," "RMLC," "Certified Laser Specialist," and "CLS."  ELI advertised ROCKY MOUNTAIN LASER COLLEGE and RMLC extensively through the internet and on its course materials.

11.     For a significant period of time, ELI used laserlaser.com to advertise its goods and services, *e.g.*, its clinic and educational course.  ELI used this site to promote ROCKY MOUNTAIN LASER COLLEGE and to drive business to ELI.

12.     Although laserlaser.com was the primary source of ELI's advertisement, it also used www.laser-college.com, www.no-hair.com, www.yes-hair.com, www.no-vein.com, www.polyfacial.com, www.laser-white.com, www.no-tattoo.com, and www.no-wrinkle.com (the eight sites, collectively, the "Websites").  ELI paid for the cost of servicing at least some, if not all, of the Websites and laserlaser.com through December 31, 2008 or 2009, even though Mr. Kunze owned them and registered them in his name individually.

13.     Through his many years in the industry and in teaching the RMLC laser education course, Mr. Kunze was well known in the aesthetic laser education industry, and touted his experience on the internet, including laserlaser.com.  While Mr. Kunze was a "gifted" teacher, he was not as educated or experienced as he touted.  While ELI's business and Certified Laser Specialist were recognized by some in the industry, they were also not as Mr. Kunze represented.  Instead, Mr. Kunze intentionally made numerous misrepresentations on the laserlaser.com website, including misrepresentations concerning the extent of his education, experience, and certifications; the number of CLS certifications that ELI had awarded to RMLC students; and that Certified Laser Specialist was a registered trademark when it was not.

14.     It was through laserlaser.com that Ms. Riggs found ELI in October 2007 and took the RMLC course taught by Mr. Kunze.  Ms. Riggs received course materials but was not restricted in any way as to its use.  ELI placed no restrictions on the use of its curriculum by its students, during or after the course was completed.

15.     In January 2008, Ms. Riggs began working for ELI.

16.     In June 2008, Mr. Kunze submitted a trademark application for the mark "CLS (Certified Laser Specialist)" (Ex. 124), to be registered in the Principal Register, stating the mark was first used as of July 28, 1997.  Mr. Kunze had a specimen prepared for a Certified Laser Specialist certificate, with the date July 24, 1997.  (Ex. 57.)  But, Mr. Kunze never completed the registration process.  Nonetheless, Mr. Kunze continued to represent to the public that the mark was in fact registered.

### C.  The Fluken-Riggs' purchase of ELI

17.     Sometime in 2008, Mr. Kunze approached Ms. Riggs and others to see if they were interested in buying ELI.  Over the course of 2008 and 2009, the Fluken-Riggs investigated

purchasing ELI from Mr. Kunze for $1 Million.  During this process, Mr. Kunze made a number

of representations to the Fluken-Riggs that were untrue, including, as material to this case:

    (i)    That Body Laser Solutions ("BLS") was owned by a couple of doctors when, in

        fact, Mr. Kunze owned BLS, and that a $23,383.00 accounts receivable from BLS

        was collectible;

    (ii)    That six THERMO-Los (electrolysis machines) in ELI's inventory had a fair

        market value and cost of $2,500.00 each when, in fact, the actual cost was

        $875.00 each; and

    (iii)    That Certified Laser Specialist was a registered trademark, when it had never

        been registered.

    18.    Mr. Fluken was skeptical about paying $1 Million for ELI and believed Mr.

Kunze overstated or exaggerated how much money the business made.  Mr. Fluken received a

schedule of fixed assets and inventory stated to be worth $455,248.00 (Ex. 41), but he did not

believe they were worth that much.  So, Mr. Kunze asked ELI's accountant for financial

information and asked Ms. Riggs for backup documentation to check the accuracy of ELI's

financials.

    19.    Mr. Fluken also relied on Ms. Riggs to verify what equipment was on the

premises and what was owned or on loan, including two working MediDerms on loan from the

manufacturer.

    20.    Meanwhile, in about November 2009, Mr. Kunze met with Arthur Barbera, an

owner of a pre-owned laser equipment company, to discuss laser related business opportunities,

including selling lasers to former and current students of ELI.  Mr. Barbera was introduced to

Mr. Kunze by Mike Sparks of Cynosure, a manufacturer of esthetic and medical equipment.  Mr. Sparks sold laser equipment to ELI's students.

21.     By December 2009, Mr. Kunze and the Fluken-Riggs agreed to a stock purchase of ELI.  The purchase price was $1 Million, to be paid with an initial deposit of $10,000.00, a loan from American Bank of Commerce ("ABC Bank") for $650,000.00, a $250,000.00 Promissory Note to Mr. Kunze, and $90,000.00 from the Fluken-Riggs.

22.     Although the parties discussed transferring the Websites to ELI, no agreement was ever reached.  Instead, Mr. Kunze and the Fluken-Riggs agreed to a transfer of ELI's stock, as memorialized in that certain Purchase and Sale Agreement ("PSA") dated December 22, 2009. (Ex. 2.)  As relevant to the issues, the PSA provides as follows:

(i)     The purchase price was $1 Million,[3] with $250,000.00 to be paid via a 5-year Promissory Note to be made by the Fluken-Riggs and ELI;

(ii)    Closing was to occur by December 23, 2009, unless otherwise mutually extended;

(iii)   All records shared by ELI with the Fluken-Riggs in anticipation of the stock purchase were "deemed confidential trade secrets and proprietary information of [ELI]," were to be returned to ELI and Mr. Kunze if the stock purchase was not completed, and ELI and Mr. Kunze could sue for injunctive and other relief in the event of the breach of such terms;

(iv)    ELI and Mr. Kunze would enter into an Independent Contractor Agreement;

(v)     The PSA contained the entire understanding and agreement between the parties;

---

[3]At the last minute, the parties agreed to reduce the sales price, but such reduction is not material to the determination of the claims.

(vi)    That documents and information received were for informational purposes only, and that Mr. Kunze did not represent, warrant, or guarantee the contents, conclusions, or opinions "contained therein";

(vii)   If the Fluken-Riggs failed to make any payment or perform as required by the PSA within the time required, Mr. Kunze's "sole remedy" was to terminate the PSA – and all other remedies were waived and released;

(viii)  If Mr. Kunze defaulted, refused, or was unable to perform as required by the PSA within the time required, the Fluken-Riggs "may" terminate the PSA and have all monies paid returned – and all other remedies were expressly waived and released; and

(ix)    With exceptions not relevant here, Mr. Kunze was precluded from disclosing or issuing any statement regarding the PSA or the sale of ELI.

23.    On December 23, 2009, Mr. Kunze and ELI entered into an Independent Contractor Agreement ("ICA") which provides, in relevant part:

(i)     The term of the ICA would be for five years, starting on December 23, 2009, unless ELI terminated the agreement for cause or agreed to release Mr. Kunze, or by mutual agreement;

(ii)    During the term of the ICA, Mr. Kunze was required to use his best efforts to provide laser removal education or training and aesthetic laser services to students or customers of ELI;

(iii)   Mr. Kunze would be "employed" as the College Director, with certain duties, including conducting four (4) classroom sessions outside of ELI's facility each year, and acting as ELI's liaison and consultant with laser manufacturers;

(iv)     ELI would pay Mr. Kunze 10% commission on gross sales generated by college enrollment;

(v)      Mr. Kunze, in acting as ELI's independent contractor, would conduct his business with the "highest ethical standards," "avoid deceptive, misleading, unethical practices," "make no false representations," and conduct business in a manner which reflected favorably on the business and the good name, goodwill and reputation of ELI;

(vi)     Mr. Kunze agreed not to compete during the term of the ICA and for two years after its termination, within twenty-five miles of ELI's offices.  Mr. Kunze agreed that he would not "*solicit, offer or provide* laser hair removal education or training or aesthetic laser services" (emphasis added) to any client or prospective client of ELI within that geographic location;

(vii)    Even where permitted to teach for his own account, there was no provision authorizing Mr. Kunze to use ELI's curriculum or marks to do so; and

(viii)   If a business opportunity came to Mr. Kunze's attention that conflicted with ELI's operations, ELI would not unreasonably withhold approval to allow Mr. Kunze to pursue this opportunity.

24.     Mr. Kunze, ELI, and the Fluken-Riggs entered into a Promissory Note for $250,000.00 dated December 22, 2009, which provides, in relevant part:

(i)      Generally, the Promissory Note is "subordinate" to the "first Note of Borrower [ELI and the Fluken-Riggs],[4] payable to ABC Bank," as long as there is an outstanding balance owed to ABC Bank;

---

[4] ELI and the Fluken-Riggs are the "Borrower" on the Promissory Note, but there is no evidence that ELI is also obligated on any note to ABC Bank.

(ii)     Seven percent (7%) interest on the unpaid balance starts to accrue on December 23, 2009;[5]

(iii)    The first payment of principal and interest ("P & I") in the amount of $35,000.00 is due and payable January 1, 2012.  The amount of $7,719.00 P & I is due per month thereafter on the 10th of each month, starting February 10, 2012, until January 1, 2015, when "notwithstanding any other language contained in the [Promissory] note," the entire balance due under the note is due in full;

(iv)    Its terms and conditions are subject to the conditions of the "Employment Agreement," *i.e.*, the ICA;

(v)     For every year in which Mr. Kunze did not complete his obligations under the ICA, and by his willful termination and breach of the ICA, $50,000.00 is deducted from the Promissory Note for each year of termination, up to $200,000.00; and

(vi)    Plaintiffs will owe a late charge of 10% of any payment not received within five (5) days after the payment is due.

25.     The Promissory Note also provides for an increase in the interest rate to 14% from the date the note is accelerated.   No notice of acceleration was ever given.

**D.  Mr. Kunze and the Fluken-Riggs' Relationship Crumbled Not Long After the Sale of ELI**

26.     ELI's business is run with the assistance of only a few people, essentially consisting of employees/officers the Fluken-Riggs, employee Mr. Kunze, Jr., an administrator,

---

[5] The second paragraph of the Promissory Note provides for interest to accrue from August 1, 2009, but paragraph numbered 2 provides interest to accrue from December 23, 2009.  The evidence shows the parties intended interest to accrue after the date the Promissory Note was executed, *i.e.*, December 23, 2009.

and independent contractor Mr. Kunze.  After their purchase of ELI, the Fluken-Riggs made a number of changes or additions to ELI.

27.     They developed a new website for ELI which was up and running by early 2011. Until then, ELI continued to use the laserlaser.com website to direct traffic to its business, which ELI made no payment to maintain.

28.     They revised ELI's course materials over time, and ELI now requires students to sign an agreement acknowledging they cannot use the ROCKY MOUNTAIN LASER COLLEGE materials outside of the class.

29.     They took a number of measures to protect the business and its data, including changing the passwords, acquiring a password protected third-party accounting system, and putting in a third-party scheduler.

30.     They maintain the confidentiality of ELI's customer list/information, which is updated with new clients and new students.  ELI does not share the information with outsiders and has password protection on the computer system which contains the list.

31.     For about the first nine months of 2010 ELI was making money and increasing its student count under the Fluken-Riggs' ownership.  Mr. Kunze was conducting classroom sessions at the Lakewood facility.  Nonetheless, when ELI asked Mr. Kunze to conduct offsite classes, he refused.  Thus, he did not conduct four classroom sessions each year on behalf of ELI outside of its Lakewood facility.

32.     Instead, in or about October 2010, Mr. Kunze began demanding that he be released from the ICA.  ELI refused to do so.  Unbeknownst to Plaintiffs, Mr. Kunze was starting to or already actively improperly competing with ELI.  It was also about this time period

(November 2010) that Messrs. Barbera and Sparks formed Quanta, a seller of new laser equipment.

33.    Thus, in December 2010, Mr. Kunze asked an ELI employee (who also worked for ELI under Mr. Kunze's ownership) to provide him with an updated student information list so that he could sell lasers to ELI's former and current students.

34.    Also about this time period, ELI increased its advertised prices for its laser education course from $4,000.00 to $6,000.00.  Notwithstanding this advertised price increase, ELI provided discounts to students for a variety of reasons.

35.    In January 2011, Mr. Kunze taught four students (employees of former ELI student Martha Livermore) in Houston, Texas.  Ms. Livermore contacted ELI at its Lakewood facility, looking for Mr. Kunze to teach a class and issue ROCKY MOUNTAIN LASER COLLEGE certificates to her employees.  Mr. Kunze offered to teach the class, at Ms. Livermore's location in Texas.  For Ms. Livermore, what was important was receiving a certificate from ROCKY MOUNTAIN LASER COLLEGE and being taught by Mr. Kunze.  Ms. Livermore thought the Certified Laser Specialist certification was important because it was represented as such by Mr. Kunze.

36.    Ms. Livermore's employees thought they were taking a ROCKY MOUNTAIN LASER COLLEGE course, but they were not.  Instead, Mr. Kunze taught a shorter class for his own business, American Laser College.  Nonetheless, he used ELI's ROCKY MOUNTAIN LASER COLLEGE marks and curriculum as if they were his own.  He handed out ROCKY MOUNTAIN LASER COLLEGE business cards, and used ROCKY MOUNTAIN LASER COLLEGE interchangeably with American Laser College such that the students thought the entities were the same.  He awarded those students CERTIFIED LASER SPECIALIST

certificates, and issued the certificates under ROCKY MOUNTAIN LASER COLLEGE's name. Mr. Kunze backdated the certificates as if they were issued in 2010, when they were not; he put a stamp on those certificates implying the certificate or course was sanctioned by the Texas Department of Education when it was not.

37.     Mr. Kunze received $4,000.00 for teaching the class but did not notify ELI or offer to share any of those earnings with ELI, despite the fact that his offer to provide the course was made within 25 miles of ELI's office.   And, despite the fact that he used ELI's curriculum and marks and represented he was teaching on behalf of ROCKY MOUNTAIN LASER COLLEGE.

38.     In competition with ELI, using ELI's information, Mr. Kunze sold lasers for Quanta to customers of ELI.  By February 2011, Mr. Kunze sold his first laser for Quanta, earning about $5,000.00 in commissions.  Thereafter, during the 1st quarter of 2011, Mr. Kunze sold lasers earning additional commissions of $15,000.00.

39.     Without Plaintiffs' knowledge, in March 2011, Mr. Kunze sought to register "Certified Laser Specialist" as his trademark.

40.     In addition, Mr. Kunze disclosed the fact he sold ELI to a number of third-parties and made disparaging remarks about ELI and Mr. Fluken and their running of the business.  Due to Mr. Kunze's negative remarks about ELI and Mr. Fluken, Ms. Livermore took her business elsewhere, hiring another instructor to train her students in Houston.  Ms. Livermore had four students trained by the new instructor and, at the time of her deposition, one more scheduled, for a total of five students.   These students use CLS and CLT designations as part of their credentials.

41.     Also during this time period, Mr. Kunze continued seeking to terminate his relationship with ELI, including "threatening" to resign.  Mr. Kunze wanted to work with Messrs. Sparks and Barbera in selling lasers to ELI's customers and conducting competing laser education classes.

42.     With Mr. Kunze unwilling to continue with the parties' current working relationship, on Monday, April 4, 2011, ELI and Mr. Kunze entered into an amendment[6] of the ICA (the "Amendment").  As relevant to this lawsuit, the Amendment provides the following would govern the parties' relationship in the future:

(i)     Mr. Kunze would be allowed to use ROCKY MOUNTAIN LASER COLLEGE's name on the laserlaser.com website, but Mr. Kunze would remove pricing and scheduling information and would provide a link to ELI's website;

(ii)    Mr. Kunze would be allowed to provide independent training off-site and use the ROCKY MOUNTAIN LASER COLLEGE approved curriculum and issue a certificate of completion, but would not be allowed to issue a Certified Laser Specialist certificate.  In order to obtain a Certified Laser Specialist certificate, the students would have to receive further training at ELI's facility.  ELI would receive a 10% commission of the tuition for such off-site classes;

(iii)   Mr. Kunze would be allowed to work with aesthetic laser manufacturers and resellers with no restrictions; and

---

[6] Titled "Amendment ("Amendment") to that certain Independent Contractor Agreement dated December 23, 2009 ("Agreement") entered into between Electrology Laboratory, Inc. d/b/a Rocky Mountain Laser College and Lorenzo Kunze."

(iv)    If Mr. Kunze taught classes for ELI throughout its fiscal 2011 class schedule (February 1, 2011 to January 31, 2012), he would be entitled to the second year of $50,000.00 earned buyout in accordance with the Promissory Note.

43.    In effect, by its terms, the Amendment also amended the Promissory Note.[7]

44.    Mr. Kunze, however, did not comply with the Amendment.

45.    First, Mr. Kunze did not teach classes for ELI throughout the 2011 fiscal year.[8] Instead, unbeknownst to Plaintiffs, Mr. Kunze was improperly competing with ELI.

46.    Mr. Kunze taught laser education courses through ANMM d/b/a The Laser Center for Education, a company formed by Messrs. Barbera, Sparks, and others.  Mr. Kunze, however, used ELI's curriculum, marks, pictures, and/or information to do so.

47.    Mr. Kunze, through the American Laser College website (laserlaser.com), advertised his services by using ROCKY MOUNTAIN LASER COLLEGE's name interchangeably with American Laser College, as if they were affiliated.  He directed customers to contact him for laser education, but used ELI's refund and other policies along with pictures of ELI's facilities and students to do so.  Mr. Kunze also represented Certified Laser Specialist was a trademark owned by him.  The laserlaser.com website had no working link to ELI's website.  At that time, ELI was also relying on the laserlaser.com website to drive student traffic to its business.

48.    On laserlaser.com, using "American Laser College" and the mark ROCKY MOUNTAIN LASER COLLEGE, along with pictures from ELI's facility, Mr. Kunze advertised that he was providing laser training on April 28-30, 2011, in Bellevue, Washington.

---

[7] The Amendment was signed only by ELI and Mr. Kunze, and no party has taken exception to the fact that it was not signed by the Fluken-Riggs who are also parties to the Promissory Note.  Accordingly, the Court assumes, without deciding, that the Amendment is also binding as to the Fluken-Riggs as it applies to the Promissory Note.
[8] There is some evidence that Mr. Kunze may have taught a class for which he claims he is entitled to payment.  Mr. Kunze, however, provided insufficient evidence as to any amount which he claims is owed.

49.     On April 18, 2011, Mr. Kunze taught two students for $2,000.00, using ELI's curriculum and marks, but later awarded them certificates through ELI's competitor, Rock Creek Laser and Aesthetics Institute ("Rock Creek").  Mr. Kunze, however, did not use Rock Creek's laser education curriculum and, at that time, had no business relationship with Rock Creek.

50.     In about late April 2011, after saving the information for his own account, Mr. Kunze deleted about 60 gigabytes of data from ELI's server, which included a list of ELI's customers – its students and clients.  Mr. Kunze did so in order to solicit business from ELI's students and clients.

51.     Also in about April 2011, ELI discovered that Mr. Kunze had not filed ELI's tax return for the year-ended January 31, 2009.  The tax return had been timely prepared, but Mr. Kunze never filed it or paid the taxes owed resulting in the Internal Revenue Service assessing interest and penalties on top of the taxes that were owed.  ELI paid the amount owed to the I.R.S. for the 2009 taxes.

52.     On April 28-30, 2011, Mr. Kunze taught the Washington class as advertised on the laserlaser.com website, again for his own account.  Mr. Kunze taught five students and gave them receipts from American Laser College.  However, Mr. Kunze used ELI's ROCKY MOUNTAIN LASER COLLEGE/RMLC marks and course materials.  Mr. Kunze used ROCKY MOUNTAIN LASER COLLEGE and American Laser College interchangeably during the course such that students thought they were the same or affiliated.  Mr. Kunze represented to the students they would receive Certified Laser Specialists certificates, but they did not.  The students were surprised or confused when they received Certified Laser Technician ("CLT") certificates from an entity they had never heard of – Rock Creek.  Regardless, those students sought *certification* for using a laser and it really did not matter much, if at all, whether it was a

CLT or a CLS.  Unbeknownst to the students, at the time the course was given, Mr. Kunze had

no business relationship with Rock Creek and did not use its approved curriculum.

53.     How these five students came about to be taught by Mr. Kunze apparently

differed.  Diane Oakley took the class after she heard from Debbie Caddell, a former ELI

student, that Mr. Kunze was coming to teach in Washington.  Bradley Jellerichs, another student,

was a new employee of Ms. Caddell, an employer who wanted all her employees to take the

course from Mr. Kunze.

54.     The relative sophistication of these students apparently varied.  Mr. Jellerich

checked whether the certification he would be receiving from Mr. Kunze's course was in fact

required, and concluded it was not.  Others, however, apparently blindly believed that it was

required.

55.     "Rock Creek" is Rock Creek Laser and Esthetics Institute and Rock Creek Medi

Spa, a company with a spa and a small laser school which offered a Certified Laser Technician

(CLT) certificate upon completion.  Rock Creek's educational curriculum is approved by the

DPOS.  The Washington students received Rock Creek certificates because ELI would not issue

ROCKY MOUNTAIN LASER COLLEGE certificates for the course taught.

56.     ELI would not issue ROCKY MOUNTAIN LASER COLLEGE certificates

because Mr. Kunze's offsite students were only to receive certificates of completion.  In

addition, by the time Mr. Kunze requested ELI to issue the certificates, the parties' relationship

had terminated.

57.     Specifically, on May 2, 2011, ELI terminated the Amendment for cause after

discovering Mr. Kunze was not linking the laserlaser.com website to ELI's website and had

downloaded student and client information from ELI's server.  In addition, on the

laserlaser.com website, Mr. Kunze was representing that he owned the trademark Certified Laser Specialist.

58.     ELI asked Mr. Kunze to leave ELI's premises and to cease using its marks.  Mr. Kunze believed ELI had terminated the parties' agreements, and the Court so finds.

59.     Also on that date, Mr. Kunze taught a student for $1,000.00 and subsequently awarded him a certificate from Rock Creek.   Again, this was before Mr. Kunze had any relationship with Rock Creek.  As Mr. Kunze had neither his own curriculum nor Rock Creek's to use, the Court finds that he must have used ELI's.

60.     On the following day, May 3, 2011, Mr. Kunze, through ANMM, offered ELI a check for $1,575.00 as its 10% commission for the class taught in Washington in exchange for Certified Laser Specialist certificates.  ELI did not cash the check as the Amendment provided that only certificates of completion would be given.  The Washington students paid $3,150.00 each, for a total of $15,750.00 in tuition for the course.

61.     About this time, ELI allowed Mr. Kunze to take two THERMO-Los with the understanding that he would replace them.  Despite demand, Mr. Kunze has never done so.  The THERMO-Los had a value of $875.00 each.

62.     ELI also allowed Mr. Kunze to take two MediDerms, each valued at $15,000.00, which he ultimately returned but in an inoperable condition with no value.  The value of all equipment taken was $31,750.00 ($1,750.00 [$875.00  x 2 = THERMO-Los] + $30,000.00 [$15,000.00 x 2 = MediDerms]).[9]

---

[9] Plaintiffs claim the damages are $37,000.00, but the Court finds otherwise.  Plaintiffs' claim is based on a value of $3,500.00 for each THERMO-Lo, relying on the original inventory information received when the business was purchased.  (Ex. 35.)  The April 30, 2009, Schedule of Fixed Assets and Inventory, however, stated the "cost" and "estimated FMV [fair market value]" of six THERMO-Los in inventory are $15,000.00; therefore, the cost and FMV of each THERMO-Lo would be $2,500.00.  (Ex. 41, ELI00256.)  Nonetheless, Mr. Fluken testified that he did not believe the values he was provided, and he subsequently discovered the THERMO-Los cost $875.00 each.  (Ex. 83.)  Accordingly, the Court finds the value to be $875.00 for each THERMO-Lo.

63.     After Mr. Kunze was removed from the premises, ELI discovered that Mr. Kunze had been selling THERMO-Los to ELI's students, even after he sold ELI to the Fluken-Riggs. Those sales totaled $174,295.00.  (Ex. 85.)  Of those sales, three were to students who took classes in April 2011, on or after the April 4, 2011 Amendment which allowed Mr. Kunze to make such sales without restrictions.[10]  Those sales totaled $10,500.00; therefore, sales between December 2009 and April 3, 2011 totaled $163,795.00 ($174,295.00 - $10,500.00).

64.     With the termination of the parties' agreements, any prohibition against equipment sales also terminated.  The non-compete (non-solicitation of prospective, current, and former clients for laser education and services), confidentiality, and indemnification provisions, however, survived.  Thus, Mr. Kunze was still bound by the two-year non-compete, which applied until May 2013.  Mr. Kunze, however, competed.

65.     On laserlaser.com and other websites (such as no-hair.com and no-tattoo.com), Mr. Kunze made numerous false and misleading advertisements to the public.  For example, Mr. Kunze represented one site was sponsored by ROCKY MOUNTAIN LASER COLLEGE or RMLC, when it was not; that CLS or Certified Laser Specialist was trademarked in 1997, when it was not; that there are 4,500 CLS specialists worldwide, when there was and is not; and that ROCKY MOUNTAIN LASER COLLEGE is associated with ALC and International Laser College, when it was and is not.  Mr. Kunze, without authorization, used ELI's pictures and video, address, marks, policy, and curriculum.  Mr. Kunze even displayed pictures of celebrities Mike Tyson or Beyoncé on two of these sites.

---

[10] ELI offered 40-hour courses, and any April 2011 course – and sales based on that course – would have been on or after Monday, April 4, 2011.  The parties, however, entered into the Amendment on April 4, 2011.  Thus, sales during or after any April 2011 course would be allowed, but not if such sales were made possible through the use of ELI's customer list.

66.     On May 7, 2011, Mr. Kunze approached Rock Creek about a potential buyer for its laser school, but no sale ever materialized.  Instead, on or about May 17, 2011, ANMM and Rock Creek agreed that Mr. Kunze would train students under the auspices of Rock Creek and its curriculum, and certified laser technician certificates would be issued to students in exchange for 5% of the tuition fees.  Mr. Kunze, however, asked Rock Creek to change its certificates to "Certified Laser Specialists" or to include "CLS."

67.     In connection with his association with Rock Creek, Mr. Kunze used the laserlaser.com website to drive business to him.  His false advertisements to consumers included misrepresenting that CLS was trademarked; using testimonials of ELI's students for that of Rock Creek or "The Laser College"; and using pictures and curriculum from ELI.

68.     Between May 2, 2011 and August 19, 2011, Mr. Kunze trained 12 students, 11 of whom who paid a total of $37,500.00.   Mr. Kunze used Rock Creek's license to issue these students certificates, but three of the students were trained before May 17, 2011, when Mr. Kunze had no agreement with Rock Creek.  Moreover, Mr. Kunze issued certificates under Rock Creek's name but used, at least in part, ELI's curriculum and marks.

69.     Mr. Kunze, Jr. continued to work for ELI after Mr. Kunze's removal, but not for long.  On or about May 26, 2011, ELI terminated Mr. Kunze, Jr. after discovering that he was "rebranding" ELI's ROCKY MOUNTAIN LASER COLLEGE course materials as American Laser College materials for use by Mr. Kunze in teaching classes in competition with ELI.  Mr. Kunze, Jr. had apparently done so for the Washington class.

70.     On June 24, 2011, Mr. Kunze – again – sought to register Certified Laser Specialist as a trademark on the Principal Register, representing that he owned the mark, and that the mark had been used in commerce as early as July 1996.

71.     On July 21, 2011, ELI filed suit.  Mr. Kunze continued to compete.

72.     Mr. Kunze continued to offer laser education courses, and to use ELI's pictures on the laserlaser.com website.  One of Mr. Kunze's LinkedIn profiles stated he is the owner of Rocky Mountain Laser College.

### E.  Mr. Kunze disparages ELI and Mr. Fluken

73.     After the parties' relationship terminated, Mr. Kunze not only competed against ELI but also made disparaging remarks about ELI and Mr. Fluken in order to do so.

74.     On May 6, 2011, Mr. Kunze wrote to a Cynosure representative disparaging Mr. Fluken and his operation of ROCKY MOUNTAIN LASER COLLEGE, along with the services they provided.  At that time ELI had Cynosure equipment on loan.

75.     In February 2012, Mr. Kunze spread rumors that ELI was shutting down, so that he could reacquire the business.  Mr. Kunze spread these rumors to ABC Bank and to ELI's landlord, and advised them that he – Mr. Kunze – could make a go of the business.  Mr. Fluken had to convince the bank and landlord otherwise.

### F.  The "Current" State of Affairs

76.     On November 4, 2014, ELI registered Certified Laser Specialist as a service mark on the U.S. Patent and Trademark Office's Supplemental Register.  (Ex. 175)  ELI's application to register the mark on the Principal Register was declined. (Ex. G.)

77.     At the time of trial, Mr. Kunze owned two websites laserlaser.com and no-hair.com, but only the former was active.

78.     Plaintiffs have made no payments on the Promissory Note.

### G.  Other Misrepresentations

79.    Before and after the sale of ELI to the Fluken-Riggs, Mr. Kunze made numerous false and/or misleading advertisements in order to influence consumers to purchase his goods (*e.g.*, lasers) and services.  For example, in his advertising, Mr. Kunze said he is an M.E., implying he has a medical background when he does not; implied he has a degree in electrical engineering from Red Rocks Community College when he does not; stated he had "professional experience" with the American Heart Association when all he did was take a CPR course; said he was associated with numerous laser associations, including international associations, when he was not; implied he had written for a number of "laser publications" when he supposedly was only "quoted" "in quite a few of them"; and represented that 2,500 or 4,500 Certified Laser Specialist certificates were awarded, which were not.  In addition, he advertised that he held a number of patents, including "laracaine" (purportedly a skin desensitizer), laser googles, a thermo-paper template, and THERMO-Lo, when he did not.  Mr. Kunze's misrepresentations know no bounds.

### H.  The Experts and ELI's Financials

80.    ELI's class revenues were as follows: $455,548 (FYE[11] January 31, 2009); $301,973 (FYE January 31, 2010)[12]; $415,665 (FYE January 31, 2011); $276,337 (FYE January 31, 2012); $462,045 (FYE January 31, 2013); and $411,498 (FYE January 31, 2014).  (Ex. 144)

81.    Paul Cadorette, Plaintiffs' expert ("Plaintiffs' Expert"), issued two opinions concerning ELI's losses.  The first opinion was issued on August 8, 2012, opining ELI suffered damages in the amount of $779,073.00.  (Ex. 155.)  The second opinion was issued on November 19, 2014, opining ELI suffered damages in the amount of $493,832.00 (for fiscal

---

[11] Fiscal year ended.

[12] Mr. Kunze had health issues that year.

years ending January 31, 2011 through January 31, 2017).  (Ex. 144.)  The difference in the amounts resulted primarily from the fact that, in the latter report, Plaintiffs' Expert had additional actual data from which to project damages.  Plaintiffs rely on the second report on which to base ELI's claim for damages.

82.      Plaintiffs' Expert's methodologies, and resulting calculations, are unreliable and/or speculative in a number of respects, as addressed below:

(a)  The difference between Plaintiffs' Expert's initial projected loss and revised projected loss (based on additional actual figures) is $285,241.00 (37% of his original calculation), showing there are significant flaws in his assumptions;

(b)  His calculations were based on an assumed sustained growth rate of 5% per year, using January 31, 2011 as the base year, but that is unsupported by reliable data or other information.

(i)  First, the assumption was based on Mr. Kunze's indication to ABC Bank that it was a great time to buy ELI, but Mr. Kunze never used a 5% figure; and

(ii)  Next, the assumption relied on Exhibit E, the valuation performed for ABC Bank in anticipation of making the loan to the Fluken-Riggs, which Plaintiffs' Expert testified had much greater classroom revenues projected than the 5% he used. The valuation did have a greater than 5% projected increase, but in *clinic*,[13] not class, income.  Instead, there was a five percent (5%) class revenue increase forecasted for 2010 ($458,682 actual for 2009 and $480,000 forecasted for 2010); a 10% increase forecasted for 2011; and no increase forecasted for 2012.

(c)  Mr. Kunze ceased providing any assistance to ELI post-May 2, 2011, but ELI's class revenues nonetheless increased more than Plaintiffs' Expert projected.

---

[13] Of course, this would result in an overall projected increase in revenue of greater than 5%.

83.     Plaintiffs' Expert's calculations were based on the ICA running five years, with a two-year non-compete thereafter.  Damages were therefore calculated for a total of seven years (fiscal year ended January 31, 2011 through January 31, 2017), with no class revenue loss for FYE 2013.  The ICA, as amended, however, was terminated by May 2011 and the two-year non-compete ran by May 2013.  Thus, for example, Mr. Kunze would be entitled to compete on or about May 2, 2013, just not improperly by, for example, stating he is affiliated with Rocky Mountain Laser College.

84.     Plaintiffs' Expert's methodology for determining, and its determination of, certain losses or earnings are reasonable and reliable:

(a)  The determination of ELI's average earnings per student of $2,640.00 (Ex. 154, 156);

(b)  The determination of the estimated costs of equipment at 71% of the sales price.  (Ex. 144, Schedule 7; Ex. 151.); and

(c)  The determination of average costs per class at 28.6% of revenues (Ex. 144, Schedule 8).

85.     Plaintiffs' Expert's *methodology* for determining lost equipment sales for year-ended January 31, 2011 is reasonable and reliable.  The *figure* calculated for lost equipment sales for year-ended January 31, 2011, however, is not; therefore, all calculations based on such numbers are also incorrect.

(a)  The number and amount of sales to students, post-sale of ELI, is based on Exhibit 85 and Plaintiffs' Expert's review of the supporting invoices.  That figure is $174,295.00.  Exhibit 85, however, shows that five of those sales (totaling $19,750.00) are *post*-January 31, 2011.  Thus, sales FYE January 31, 2011, were actually $154,545.00 ($174,295.00-$19,750.00).

(b) ELI's net lost profit in commission sales FYE January 31, 2011 is $81,222.00 ($154,545.00 - $73,323.00).[14]

(c) As stated, there were five sales totaling $19,750.00 post-January 31, 2011.  Of those five sales, two sales were made between January 31, 2011 and April 3, 2011, totaling $9,250.00.  The other three sales were made post-April 4, 2011, totaling $10,500.00.[15]

(d) Plaintiffs' Expert assumed lost equipment sales after January 31, 2011, but, by the Amendment entered into April 4, 2011, Mr. Kunze was allowed to make such equipment sales in competition with ELI.  However, Mr. Kunze was not allowed to use ELI's customer list to do so.  Nonetheless, except for the five post-January 31, 2011 sales made to students of ELI in February and April 2011, there is insufficient evidence that Mr. Kunze thereafter made sales using ELI's customer list, to sustain a finding of damages on that basis.  Therefore, no loss has been shown for the subsequent years.

86.     Plaintiffs' Expert assumed that all projected losses were caused by Mr. Kunze's actions, and recoverable on all claims.  His methodology did not consider other factors in projecting future losses, such as ELI's increase in pricing.  Moreover, his methodology should have – but failed to – distinguish between losses recoverable on the different claims.  For example, ELI seeks to recover lost laser sales from Mr. Kunze's use for ELI's customer list – a claim that clearly would not support all the general lost profits projected.

87.     Mr. Kunze's expert, Lisa Meer ("Defendants' Expert"), critiqued Plaintiffs' Expert and opined on Mr. Kunze's damages arising from the non-payment of the Promissory

---

[14] The $73,323.00 cost for such sales was determined as follows:  $87,148.00 (actual costs for all sales on Ex. 85, including the five items sold post-January 31, 2011) - $13,825 ($19,750.00 [sales price of the five items sold post January 31, 2011] x .71 (FOF 84(b) - cost of equipment)).
[15] The three sales (totaling $10,500.00) post-April 4, 2011, occurred when Mr. Kunze was allowed to make laser equipment sales, albeit not through the use of ELI's customer list.

Note.  Defendants' Expert offered criticisms, but could not say ELI suffered no damages.  Her opinions too suffered from some of the flaws she assigned to Plaintiffs' Expert, *e.g.*, the erroneous reliance on an assumption not supported by the evidence.

88.     Defendants' Expert's opinion regarding Mr. Kunze's damages is based on the assumption that the entire amount ($250,000.00) was due under the Promissory Note.  This opinion is based on facts contrary to those found by the Court; therefore, they will not be considered.

## II.     CONCLUSIONS OF LAW

To the extent that any findings of fact are deemed to be conclusions of law, they are incorporated herein by reference as conclusions of law.

### A.  Subject Matter Jurisdiction

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1338 and 15 U.S.C. §1121 over ELI's Lanham Act claims, and pursuant to 28 U.S.C. §1367 over the remaining claims, counterclaims, third-party claims, and third-party counterclaims.

### B.  Three Agreements, Not One

The PSA, ICA, and Promissory Note are not one contract but, rather, three related contracts that should be read together.  The PSA provides that $250,000.00 of the purchase price is to be paid by "means" of a promissory note "in the form and in accordance with the terms reflected in Exhibit A … incorporated herein by reference."  Similarly, the PSA requires the Fluken-Riggs to "cause" ELI to sign the ICA "in the form attached hereto and incorporated herein by this reference."  These provisions, and the agreements as a whole, do not support the finding that these three documents constitute one contract, or that all parties were parties to all three agreements.

### C.  The "Contractual Claims"

#### 1.  Termination is Not Plaintiffs' Sole Remedy

Contrary to Mr. Kunze's contention, Plaintiffs' remedy in this case is not limited to

termination of the PSA.  Section 9 of the PSA provides that "time is of the essence," and if Mr.

Kunze defaults or refuses to perform "within the time required" in the PSA, the Fluken-Riggs

may terminate the PSA and have their monies paid returned.  "All other remedies" are expressly

waived.  When the paragraph (and the agreement) is read as a whole, this limitation relates to

Mr. Kunze's performance in closing on the stock purchase contemplated under the PSA, such as

executing a "Stock Power."  This limitation is inapplicable to the performance under the ICA or

Amendment.  Moreover, this agreement is between the Fluken-Riggs and Mr. Kunze; ELI is not

a party.  Accordingly, Section 9 does not bar the remedies Plaintiffs seek.[16]

#### 2.  Fraud in the Inducement of the PSA – the Fluken-Riggs' Second Third-Party Counterclaim Against Mr. Kunze

The Fluken-Riggs allege they were fraudulently induced into entering into the PSA and,

accordingly, seek damages and the cancellation of the Promissory Note as to all promisors –

including ELI.  The Court finds the Fluken-Riggs failed to establish this claim.

In order to establish fraudulent representation, the Fluken-Riggs must establish: (1) Mr.

Kunze made a false representation of a past or present fact; (2) the fact was material; (3) at the

time the representation was made, Mr. Kunze knew the representation was false or was aware

that he did not know whether the representation was true or false; (4) Mr. Kunze made the

representation with the intent that the Fluken-Riggs would rely on the representation; (5) the

Fluken-Riggs relied on the representation; (6) the Fluken-Riggs' reliance was justified; and (7)

the reliance caused the Fluken-Riggs damages.  C.J.I.-Civ. 4th 19:1 (2015); *see Student*

---

[16] It should be noted that Mr. Kunze's claim for breach of the Promissory Note is inconsistent with his contention that paragraph 9 of the PSA limits the parties' remedy to the termination of the PSA.

*Marketing Group, Inc. v. College P'ship, Inc.*, 247 F. App'x 90, 100 (10th Cir. 2007) (unpublished) (discussing fraudulent concealment).  The Fluken-Riggs have raised a number of representations as fraudulent.  The Court has grouped them into five categories and will address them accordingly.

First, the Court finds Mr. Kunze knowingly made false representations concerning his educational and professional background, the number of CLS certificates that had been awarded, the necessity of having a CLS certificate, and other matters related to the CLS certifications with the intent that the Fluken-Riggs rely on such representations.  Nonetheless, even assuming they were material to the Fluken-Riggs' decision to enter into the PSA and reliance was justifiable, the Fluken-Riggs have shown no damages.  Here, the damages sought arise from Mr. Kunze's failure to perform in accordance with the terms of the ICA and Amendment, and other misconduct.

Next, as for any financial information provided by or on behalf of Mr. Kunze, such as the collectability of the Body Laser Solution receivable and the value of ELI's equipment and inventory, the Court finds there was no reliance on the part of the Fluken-Riggs as to such information.  Instead, the Fluken-Riggs were skeptical and distrusted financial information that was received, so Mr. Fluken, on behalf of the Fluken-Riggs, conducted his own due diligence and independent investigation into ELI's financials reports/statements.

Third, the Court finds Mr. Kunze knowingly falsely represented to the Fluken-Riggs that Certified Laser Specialist and CLS were registered trademarks, only available for issuance from and for use by ELI.  Such facts were material and upon which the Fluken-Riggs justifiably relied.  The question is whether the Fluken-Riggs have been damaged by this misrepresentation, as they have presented insufficient evidence on this issue.  While there is evidence that ELI has suffered

damages, as evidenced by Mr. Kunze's attempt – after the sale of ELI to the Fluken-Riggs – to register the marks for himself, and by ELI's diminished ability to protect its interest in the marks in this very lawsuit against Mr. Kunze, such injury does not support a claim for damages as to the Fluken-Riggs. *See Nicholson v. Ash,* 800 P.2d 1352, 1356 (Colo. App. 1990) (shareholder without standing to complain for injury to corporation, as any injury to them was indirect)

Fourth, the Court finds Mr. Kunze knowingly concealed that he did not file ELI's tax returns or pay ELI's tax liabilities for the tax year ended January 31, 2009. The Fluken-Riggs could not have discovered the information with reasonable diligence in light of the fact the tax return was *prepared*, but Mr. Kunze failed to file. Nonetheless, the Court finds the information was not material to the Fluken-Riggs, *e.g.,* that they would have requested a reduction of the purchase price in light of the tax liability. To the extent the Fluken-Riggs contend they would have escrowed the amount owed until paid, they ignore the liability was that of ELI, not Mr. Kunze. Moreover, it was ELI that paid for not only the taxes owed but also the associated interest and penalties. And, regardless of when the taxes were paid, the tax itself would have been owed by ELI. Thus, even assuming, *arguendo*, the information was material to their decision to purchase ELI, the Fluken-Riggs failed to show they have been damaged. *See Nicholson v. Ash, supra.*

Finally, as for ELI's course curricula and student/customer list, the evidence presented was insufficient for the Court to find Mr. Kunze made fraudulent representations concerning their confidentiality or otherwise upon which the Fluken-Riggs justifiably relied.

In summary, while the evidence shows Mr. Kunze made fraudulent representations to the Fluken-Riggs as to some of the matters claimed, the Fluken-Riggs have not shown they reasonably relied and/or were damaged by such representations.

The Fluken-Riggs also seek cancellation of the Promissory Note as to all Plaintiffs as a remedy for Mr. Kunze's actions, but the Court finds a lack of factual evidence and legal authority to support such relief.  First, as stated, the Fluken-Riggs have failed to establish their claim; therefore, they are entitled to no damages.  Further, generally, a party who has been fraudulently induced into entering into an agreement may either sue to rescind the contract, or affirm the contract and sue in tort.  *W. Cities Broad. Inc. v. Schueller*, 849 P.2d 44, 48 (Colo. 1993); *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1004 (Colo. 2008).   A party cannot do both.  *Joyce v. Davis*, 539 F.2d 1262, 1266 (10th Cir. 1976) (citing *Kelley v. Silver State Sav. & Loan Ass'n*, 534 P.2d 326 (Colo. App. 1975).  Here, the Fluken-Riggs did not seek to rescind the contract but, instead, sued in tort; therefore, rescission of the Promissory Note is not permitted, even assuming they otherwise established their claim.  Accordingly, the Court finds in favor of Mr. Kunze on this claim.  In light of the Court's determination, it need not decide whether the claim would otherwise be barred by the economic loss rule or the integration clause.

### 3. Breach of the PSA – The Fluken-Riggs' First Third-Party Counterclaim Against Mr. Kunze

The Fluken-Riggs contend that Mr. Kunze breached the PSA in three respects: (1) failing to treat the customer/student information as trade secrets and proprietary information and using that information for his own benefit, in violation of paragraph 4; (2) advertising and otherwise disclosing the sale of ELI to third-parties, in violation of paragraph 13; and (3) failing to convey to ELI the Websites.  Upon consideration of the evidence, the Court finds there has been a breach of the PSA (though not to the extent claimed), but no damages have been shown or the relief sought may not be awarded.

First, paragraph 4 provides that information shared by ELI with the Fluken-Riggs "shall be deemed [ELI's] confidential trade secrets and proprietary information," such information shall

be returned if the sale of ELI's stock is not completed, and if the Fluken-Riggs breach or threaten to breach paragraph 4, ELI and Mr. Kunze would be entitled to injunctive and other relief against the Fluken-Riggs.  Read as a whole, in order to protect ELI and Mr. Kunze, this paragraph obligates the Fluken-Riggs to keep information disclosed in connection with the stock purchase confidential and affords ELI and Mr. Kunze a remedy in the event of a breach by the Fluken-Riggs.  This paragraph does not obligate Mr. Kunze to keep such information confidential in favor of the Fluken-Riggs.  As such, Mr. Kunze did not breach paragraph 4.

Next, paragraph 13 of the PSA precludes Mr. Kunze from issuing "any statement, announcement or press release regarding this Agreement…or otherwise disclose the existence or contents of this Agreement," with exceptions not applicable here.  Mr. Kunze, however, repeatedly breached this provision by informing third-parties of the PSA.  As the remedy for Mr. Kunze's breach, the Fluken-Riggs seek rescission of the Promissory Note – not the PSA on which the Promissory Note is based.  The Fluken-Riggs have presented no persuasive legal authority or evidence to support that they may keep the company, but cancel the Promissory Note in its entirety.  The Court finds they may not.

Finally, as to the transfer of the disputed Websites, ELI may have paid to have them maintained prior to sale, but they were owned by Mr. Kunze.  Further, the PSA is a stock purchase agreement and contains no requirement that Mr. Kunze transfer "title" to or ownership of such Websites to ELI, or anyone else.  No agreement was ever reached to transfer the Websites to ELI or the Fluken-Riggs.  Therefore, the failure to transfer is not a breach of the PSA, and transfer will not be ordered.[17]

Based on the foregoing, the Court finds in favor of Mr. Kunze on the Fluken-Riggs' First Third-Party Counterclaim for breach of the PSA.

---

[17] The Court also notes there is no evidence that Mr. Kunze still owns any of these Websites, other than no-hair.com.

### 4. Economic Duress as Basis to Void the Amendment - ELI's Fourth Claim against Mr. Kunze

ELI seeks to void the Amendment on the basis of economic duress.[18] "A contract is voidable on the grounds of duress if a party's manifestation of assent is induced by an improper threat that leaves no reasonable alternative." *Vail/Arrowhead v. Eagle County Dist. Ct.*, 954 P.2d 608, 612 (Colo. 1998); *Bennett v. Coors Brewing Co.*, 189 F.3d 1221, 1231 (10th Cir. 1999). However, "[a]n improper threat does not constitute economic duress if the victim fails to pursue a reasonable alternative but instead yields to the threat." *Vail/Arrowhead*, 954 P.2d at 613 (citing Restatement (Second) of Contracts § 175 cmt. b (1981)).  Moreover, the exertion of pressure through threats is not sufficient, "it must also clearly appear that the force or threats employed actually subjugated the mind and will of the person against whom they were directed, and were thus the sole and efficient cause of the action which he took." *Premier Farm Credit, PCA v. W-Cattle, LLC*, 155 P.3d 504, 521 (Colo. App. 2006) (quotation marks and citation omitted); *Bennet*, 189 F.3d at 1231.

Here, the Court finds the evidence does not support ELI's claim for economic duress. First, the Court is not persuaded by the testimony that ELI felt it had no choice when Mr. Kunze threatened to quit.  Next, Mr. Kunze's threat occurred over a period of time, allowing ELI an opportunity to reflect on its options and to consult with an attorney, if it had wished to do so. Finally, the parties negotiated new terms which were not one sided as the Amendment modified all parties' rights and obligations, and benefitted the Fluken-Riggs individually as well through the modification of the Promissory Note.  Based on the evidence, the Court finds no duress and,

---

[18] Plaintiffs' filing subsequent to the completion of the bench trial argues that if the Amendment is not an accord and satisfaction, or if any accord was not satisfied, it is unnecessary to rescind the Amendment.  (ECF No. 241, page 9.) In light of this "conditional" argument, the Court will address ELI's claim to void the Amendment due to economic duress.

accordingly, the Amendment may not be voided.  The Court finds in favor of Mr. Kunze on this claim.

### 5.   Breach of the ICA and Amendment – ELI's Fifth Claim Against Mr. Kunze

The first issue for resolution is whether the Amendment was an accord and satisfaction of the ICA.  The Court finds it is not.

An accord and satisfaction requires the following: after the defendant and plaintiff had entered into a contract (here, the ICA), they entered into a later contract (here, the Amendment); the plaintiff and defendant knew or reasonably should have known that the later contract cancelled or changed their remaining rights and duties under the earlier contract; and the defendant has fully performed the duties he agreed to perform under the later contract.  CJI-Civ. 30:28 (2015).  In order to be effective, the relevant facts must be known to both parties. *Metropolitan State Bank v. Cox*, 134 Colo. 260, 302 P.2d 188, 193 (1956).

Here, neither the Amendment nor the evidence presented shows an accord and satisfaction.  The Amendment was entered into to address Mr. Kunze's desire to engage in other activities and to modify the parties' rights and obligations going forward, but only as to certain terms.  It was neither offered as full satisfaction of Mr. Kunze's obligations under the ICA, nor an agreement which contemplated or accounted for the damages arising from Mr. Kunze's breaches of duties under the ICA.  For example, at the time the parties entered into the Amendment, ELI was not aware that Mr. Kunze had taught the Texas class or made equipment sales to ELI's students/customers.  Accordingly, ELI is not precluded from seeking relief for breach of the ICA and Amendment.

Five breaches are claimed, and the Court so finds.[19]  First, Mr. Kunze's equipment sales

for his own account in competition with ELI breached the ICA.  Under the ICA, Mr. Kunze's

duties included acting as a liaison and consultant for ELI with the laser manufacturers.  The

scope of such duties are not specifically identified, but is broad enough to include facilitating

equipment sales for the benefit of ELI, duties which Mr. Kunze had performed on behalf of ELI

prior to its sale to the Fluken-Riggs.  Moreover, the ICA required ELI's approval for Mr. Kunze

to engage in activity which would conflict with the operations of ELI, operations which included

the sale of laser equipment.  Finally, the parties' conduct show that was their intent, as

demonstrated by the parties' inclusion of a provision in the Amendment to allow Mr. Kunze to

work with laser manufacturers and resellers without restrictions.[20]  Accordingly, Mr. Kunze's

sale of equipment prior to April 4, 2011, breached the ICA.  ELI was damaged by what it would

have earned on such sales, *i.e.*, $84,102.00.[21]

Next, Mr. Kunze taught a Houston, Texas class in January 2011 for his own account,

without the knowledge of ELI, in breach of the ICA.  Mr. Kunze was required to conduct four

(4) classroom sessions outside the Denver facility each year, but on behalf of ELI.[22]  Thus, ELI

---

[19] To the extent any other breaches are still claimed, the Court finds either the argument was abandoned or the evidence insufficient to show either a contractual duty or breach of such duty.  For example, in Plaintiffs' Amended Findings of Fact and Conclusions of Law ("FOF") (ECF No. 226, page 37), submitted prior to trial, Plaintiffs asserted Mr. Kunze solicited Mr. Kunze, Jr. in breach of the ICA.  No such evidence was presented at trial.  Similarly, in the FOF, Plaintiffs alleged Mr. Kunze breached paragraph 6.1 of the ICA by failing to indemnify ELI for the 2009 tax liabilities, but neither argument nor evidence was presented in support of such a breach at trial.

[20] To the extent such provisions are ambiguous, the Court may consider extrinsic evidence to explain or clarify the terms.  *Cheyenne Mountain School Dist. No. 12 v. Thompson,* 861 P.2d 711, 715 (Colo. 1993); *East Ridge of Fort Collins, LLC v. Larimer & Weld Irr. Co.,* 109 P.3d 969, 974-75 (Colo. 2005).

[21] Based on Exhibit 85 and the cost of equipment (FOF 84(b)): $163,795.00 (sales through February 2011 [$174,295.00 total sales - $10,500.00 sales post-April 4, 2011]) - $79,693.00 (costs for sales through February 2011 [$87,148.00 total costs - $7,455.00 (0.71x $10,500.00) costs post-April 4, 2011]).

[22] To the extent Mr. Kunze contends he was free to compete because he taught outside the 25-mile radius, this is a red herring.  First, because ELI contends the violation at issue is the failure to teach 4 outside classes on behalf of ELI.  Secondly, because Mr. Kunze was precluded from directly or indirectly soliciting, *offering*, or providing laser hair removal education to any client or prospective client of ELI within the prohibited geographic area.  Here, when Martha Livermore contacted ELI in *Colorado* to ask if Mr. Kunze would teach a course for her group, Mr. Kunze offered to do so, representing it would be on behalf of ELI when it was not so.

was damaged in the amount of $2,456.00 ($4,000.00 in tuition - $400.00 [10% commission Mr.

Kunze would have earned] - $1,144.00 [$4,000.00 x 0.286 (cost of class)[23]]).[24]

Third, Mr. Kunze used ROCKY MOUNTAIN LASER COLLEGE on laserlaser.com

without linking to ELI's website, in breach of the Amendment.  The Court finds that ELI was

damaged by Mr. Kunze's breach, but the difficulty lies in determining the amount of damages.

Plaintiffs' damages expert provided a "global" calculation of damages, without differentiating –

or even attempting to differentiate or to otherwise account for – losses which were caused by Mr.

Kunze's various misconduct.  The evidence, however, provides some basis for determining what

business was lost to Mr. Kunze due to his failure to comply with the Amendment.  Here, after the

Amendment was entered into, but before it was terminated, Mr. Kunze taught several classes, for

which $17,750.00 in gross sales were generated.  This consists of the $2,000.00 in tuition for the

April 18, 2011 class and $15,750.00 tuition for the April 28, 2011 Washington class.  These

classes were driven by the commercial internet advertisements using ELI's RMLC mark and

pictures, and taught using ELI's curriculum, without linking to ELI's website.  Under the

Amendment, ELI is entitled to a 10% commission of tuition received from students from off-site

classes.  According, ELI is awarded damages in the amount of $1,775.00.

Fourth, Mr. Kunze advertised classes for which a CLS designation would be awarded, in

violation of the Amendment.  There is some evidence that some students took the course to

receive the CLS designation (either because they believed so or because they were so advised).

Seven students (two on April 18[25] and five in Washington on April 28-20, 2011) took the class

from Mr. Kunze after the Amendment was entered into but before it was terminated, with tuition

---

[23] FOF 84(c).

[24] Although Mr. Kunze conducted this class outside of Washington, the amount of expenses, if any, he incurred in connection with teaching this class offsite for which he may have been entitled to reimbursement is unknown.

[25] These students received CLS certificates which also included the designation of "Certified Laser Technician." (Ex. 101.)

totaling $17,750.00.  ELI is entitled to an award of $1,775.00, representing the 10% commission it would have earned from off-site classes.  Any duplication in damages will be addressed in the Court's total award of damages.

Finally, ELI claims Mr. Kunze breached the post-termination non-compete provision. The Court agrees, but finds any breach would have occurred after the parties' relationship terminated on May 2, 2011.[26]  The damages shown, however, are limited.  Here, ELI presented evidence that between May 2, 2011 and August 19, 2011, Mr. Kunze taught twelve students using Rock Creek's license, for a total of $37,500.00.  In light of Mr. Kunze's post-termination prohibition from "solicit[ing], offer[ing], or provid[ing] laser hair removal education and training" within a 25-mile radius of ELI's office, the Court finds damages in the amount of $37,500.00.

In summary, Mr. Kunze has breached the ICA and Amendment for which $127,608.00[27] in damages have been shown.

6.    **Breach/Anticipatory Breach of the Promissory Note – Mr. Kunze's Third Counterclaim/First Third-Party Claim against Plaintiffs; and Declaratory Relief on Promissory Note – Mr. Kunze's Fifth Counterclaim/Second Third-Party Claim against Plaintiffs**

Mr. Kunze is entitled to relief on his counterclaims/third-party claims for breach of the Promissory Note.  The Promissory Note states it is "subordinate" to the note payable to the ABC Bank.  When the note is read as a whole, this provision does not "stay" or otherwise hold in abeyance Plaintiffs' obligation to make payments under the Promissory Note until the Fluken-Riggs repay the ABC Bank all that is owed.  First, Black's Law Dictionary defines "subordinate" as "[p]laced in or belonging to a lower rank, class, or position," to place in such a station, or "to

---

[26] Plaintiffs' Expert assumed damages would flow from the non-compete starting after the end of the five-year period covered under the ICA.
[27] $84,102.00 + 2,456.00 + $1,775.00 + $1,775.00 + $37,500.00 = $127,608.00.

assign a lower priority to." Black's Law Dictionary 1653 (10th ed. 2014). Examples are to subordinate a lien or to subordinate a debt to a different class of claims. Next, paragraph 3 of the Promissory Note provides that "notwithstanding any other language contained in this Note, the balance of all unpaid principal and interest shall be due and payable in full" by January 1, 2015. Thus, notwithstanding any "subordinat[ion]," at the latest, the obligation to repay Mr. Kunze in full was due by January 1, 2015, and the first payment was due by January 1, 2012. To the extent there is an ambiguity, the parties' conduct and Amendment reflect no intent that payment is deferred until the ABC Bank is paid in full.

Plaintiffs' obligation as to principal under the Promissory Note is $50,000.00. Here, under the terms of the Promissory Note, the first payment of P & I in the amount of $35,000.00 was due by January 1, 2012, subject to a reduction of $50,000.00 per year of the $250,000.00 original principal amount for each year that Mr. Kunze did not complete his obligations under the ICA due to its termination. The Amendment, entered on April 4, 2011, before the first payment was due, changed the Promissory Note's terms, allowing Mr. Kunze the second $50,000.00 earned buyout only if he complied with the Amendment. Of course, he did not do so. Instead, the Amendment was terminated on or about May 2, 2011, due to Mr. Kunze's willful breach. Accordingly, only $50,000.00 in principal is owed on the Promissory Note; no proration or apportionment is required for any services performed during the 2011 fiscal year.

Mr. Kunze is also entitled to 7% interest on the $50,000.00 until it is fully paid. He is not entitled to 14% interest as the required notice of acceleration was not given. Mr. Kunze is also entitled to the receipt of a 10% late charge as payment was not received within five (5) days after the date any of the payments were due, starting with the first payment of $35,000.00 that was due on January 1, 2012.

Finally, Mr. Kunze is entitled to recover reasonable attorney's fees and costs incurred to collect on the Promissory Note.

The Court also finds declaratory relief is warranted, in light of the parties' dispute.  The Court declares: (1) the principal amount due on the Promissory Note was – and is – $50,000.00; (2) no proration of the incremental earned buyouts is required; (3) 7% interest began to accrue on December 23, 2009, on the "outstanding balance" and continues until the amount due is paid; (4) the beginning "outstanding balance" at issue is $50,000.00; (5) the first payment of $35,000.00 in P & I was due by January 1, 2012; (6) thereafter, monthly P & I in the amount of $7,719.00 was due starting February 10, 2012, until the total due is paid in full; (7) 10% late fee is owed to Mr. Kunze for each late payment; and (8) Plaintiffs breached the Promissory Note.  The Court finds in favor of Mr. Kunze on his counterclaim against ELI and third-party claim against the Fluken-Riggs for breach of the Promissory Note and awards him $50,000.00, plus late fees, interest at 7% per annum, and reasonable attorney's fees, and costs.

### D.  The "Tort" and Statutory Claims

#### 1.  The Economic Loss Rule – In General

Defendants contend the economic loss rule bars all of Plaintiffs' claims except for those based on breach of contract.  Under the Colorado economic loss rule, "a party suffering only economic loss from the breach of an express or implied contractual duty may not asset a tort claim for such a breach absent an independent duty of care under tort law." *Town of Alma v. AZCO Const., Inc.*, 10 P.3d 1256, 1264 (Colo. 2006).   A court's duty, at the outset, is to determine the type – or source – of duty that has allegedly been breached. *Town of Alma*, 10 P.3d at 1263.   The source of the duty may be determined by considering three factors: (1) whether the relief sought is the same; (2) whether there is a recognized common law duty in tort;

and (3) whether the tort duty differs from the contractual duty.  *See BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 74 (Colo. 2004).  Certain common law claims that sound in tort which are designed to remedy economic loss may exist independently of a breach of contract claim.  *Town of Alma*, 10 P.3d at 1263.  Thus, a breach of a duty arising independently of any contract duties between the parties may support a tort action.  *Id.*; *Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 290 (Colo. App. 2009).

Although stated to preclude "tort" actions, depending on the facts and circumstances of a case, the economic loss rule may be applied to bar statutory claims as well.  *Rees v. Unleaded Software, Inc.*, 12CA1014, 2013 WL 6354532, at *6 (Colo. App. Dec. 5, 2013) (civil theft claim barred where it arose from alleged breaches of contract) (citing *Makoto USA, Inc. v. Russell*, 250 P.3d 625, 628 (Colo. App. 2009)); *Christenson v. CitiMortgage, Inc.*, No. 12-cv-02600-CMA-KLM, 2015 WL 1757076, at *5 (D. Colo. April 14, 2015) (CCPA claim not barred by economic loss rule); *Nero v. Am. Fam. Mut. Ins. Co.*, No. 11-cv-02717-PAB-MJW, 2013 WL 5323147, at *6 (D. Colo. Sept. 23, 2013) (CCPA claim barred by economic loss rule).  Nonetheless, in *Makoto,* the Colorado Court of Appeals explained that "if the legislature intended to provide a remedy in addition to a contractual one, the statutory remedy would trump the economic loss rule."  250 P.3d at 629; *see also Boehme v. U.S. Postal Serv.*, 343 F.3d 1260, 1266 (10th Cir. 2003) (economic loss rule no bar to claim under Colorado's Forcible Entry and Detainer statute as Colorado legislature provided a remedy independent of a breach of contract claim).

The Court finds the rule does not apply as sweepingly as Defendants have argued.  First, Defendants' arguments rely on the premise that the contracts – the PSA, ICA, Promissory Note, and Amendment – are one agreement, a premise which the Court has rejected.[28]  Secondly, the

---

[28] The Court recognizes the rule also applies where "the claimant seeks to remedy only an economic loss that arises from interrelated contracts."  *BRW, Inc.,* 99 P.3d at 72.

case law shows an independent evaluation of the reach of the rule is necessary as to any given

claim.  Accordingly, as appropriate, the Court will evaluate the application, if any, of the rule

when addressing each of the non-contractual claims asserted.

### 2.   Misappropriation of Trade Secrets – ELI's Third Claim against Defendants

ELI's curriculum (or curricula) is not a trade secret, but its customer list is a trade secret

which Mr. Kunze misappropriated.  Under Colorado's Uniform Trade Secrets Act ("UTSA"), a

"trade secret" is:

> any scientific or technical information, design, process, procedure, formula,
> improvement, confidential business or financial information, listing of names,
> addresses, or telephone numbers, or other information relating to any business or
> profession which is secret and of value. To be a "trade secret" the owner thereof
> must have taken measures to prevent the secret from becoming available to
> persons other than those selected by the owner to have access thereto for limited
> purposes.

C.R.S. § 7-74-102(4).   Factors to consider in determining whether a trade secret exists include:

"(1) the extent to which the information is known outside the business; (2) the extent to which it

is known to those inside the business, i.e., by the employees; (3) the precautions taken by the

holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the

value to the holder in having the information as against competitors; (5) the amount of effort or

money expended in obtaining and developing the information; and (6) the amount of time and

expense it would take for others to acquire and duplicate the information." *Harvey Barnett, Inc.*

*v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003) (quoting *Colo. Supply Co. v. Stewart*, 797 P.2d

1303, 1306 (Colo. App. 1990)).  Trade secrets can consist of a combination of elements which

are in the public domain, but their "unified process, design and operation…in unique

combination, affords a competitive advantage" to the claimant.  *Rivendell Forest Prods., Ltd. v.*

*Georgia-Pacific Corp.*, 28 F.3d 1042, 1045 (10th Cir. 1994) (quotation marks and citation omitted); *Harvey Barnett, Inc.*, 338 F.3d at 1129.

Considering all relevant factors, neither ELI's written materials nor the curriculum as a whole are trade secrets. After the Fluken-Riggs purchased ELI, some of the existing written materials used in the curriculum were modified and ELI required the students to maintain their confidentiality. ELI's materials were generally readily available and publicly known, but it packaged the materials differently from their competitors, *e.g.*, it put a logo on materials and put them into a notebook. This fact does not preclude a finding that such materials may be trade secrets. When such fact is considered with the other evidence, however, no trade secret has been shown. For example, there is little or no evidence about the effort or money expended in obtaining and developing the information, or the time and expense that would be necessary for a competitor to acquire and duplicate the information. The Court's review of the evidence offered finds any effort, money, time, or expense was relatively minimal. More importantly, the evidence fails to show any "unified process, design and operation of which, in unique combination," gave ELI a competitive advantage. *Harvey Barnett*, 338 F.3d at 1129 (quotation marks and citation omitted). Instead, the evidence shows what ELI seeks to protect and to preclude Mr. Kunze from using are his skills and experience as a teacher – his interactive or engaging teaching style acquired over years of teaching the course. This is what was of great value to ELI. Such "glue" – as denominated by Plaintiffs – is not a trade secret. *See WellSpan Health v. Bayliss*, 869 A.2d 990, 997 (Pa. Super. 2005) ("A trade secret does not include an employee's aptitude, skill, dexterity, manual and mental ability, or other subjective knowledge."); *Bradbury Co. v. Teissier-duCros*, 413 F. Supp. 2d 1209, 1226 (D. Kan. 2006) ("[A] person's strengths and weaknesses are not company trade secrets but rather subjective

general skills belonging to the employee."); *Rohm & Haas Co. v. ADCO Chem. Co.*, 689 F.2d 424, 432 (3rd Cir. 1982) ("Both Pennsylvania and New Jersey hold that the 'general knowledge, skill and experience' gained by an employee during his employment cannot be claimed as a trade secret by his employer.") (citations omitted).  Accordingly, the Court finds in favor of Defendants as to this part of ELI's claim.

The student/customer list, however, is a different matter.  Such lists can be a trade secret, *Hertz v. Luzenac Group*, 576 F.3d 1103, 1113 (10th Cir. 2009) (citing *Network Telecomms., Inc. v. Boor-Crepeau*, 790 P.2d 901, 902 (Colo. App. 1990)), and the Court finds ELI's customer list qualifies as such.  For example, after acquiring ELI, the Fluken-Riggs maintained the confidentiality of the dynamic lists which were updated with student/customer information.  *Saturn Systems, Inc. v. Militare*, 252 P.3d 516, 522 (Colo. App. 2011) ("[T]he alleged secret must be the subject of efforts that are reasonable under the circumstances to maintain its secrecy.") (citation omitted).  ELI's list under the Fluken-Riggs' ownership is not the same as that which existed at the time of Mr. Kunze's ownership.  The information was not known to others outside the business, contained information acquired over many years, would be very difficult for a competitor to acquire and duplicate, and was of great value to ELI.  While the actual effort to create the list may not be great, it took years of training students and providing services to build the list.  And, it was through the use of such list that Mr. Kunze was able to sell laser equipment to ELI's students.  Under the facts and circumstances of this case, the Court finds the time, money, effort, and expense expended on the list sufficient to be afforded protection.  Therefore, Mr. Kunze misappropriated ELI's trade secrets when he improperly acquired copies of the list in order to solicit ELI's customers.

ELI is entitled to injunctive relief and an award of damages against Mr. Kunze.[29]  The evidence supports the finding that Mr. Kunze used the list to make sales of laser equipment, resulting in damages of $87,147.00, consisting of sales made prior to the Amendment through the use of ELI's customer list ($84,102.00) and sales made after the Amendment through the use of the list ($3,045.00).[30]  The Court has already awarded $84,102.00 in damages to ELI for Mr. Kunze's sale of laser equipment in violation of the ICA, and will address this duplicative award in its final award of damages.[31]  The Court has not, however, awarded ELI damages for the sale of equipment after the Amendment.  While the sale of equipment to a student does not violate the Amendment, the use of the customer list to do so does violate the UTSA.

ELI also seeks exemplary damages.  Pursuant to C.R.S. § 7-74-104(2), "[i]f the misappropriation is attended by circumstances of fraud, malice, or a willful and wanton disregard of the injured party's right and feelings, the court…may award exemplary damages in an amount not exceeding the [compensatory/actual damages] award."  In light of the evidence presented, the Court finds Mr. Kunze's conduct was attended by circumstances of fraud, malice, and willful and wanton disregard of ELI's rights.  Accordingly, an award of exemplary damages in the amount of $87,147.00 is appropriate.

The award, and ELI's claim, is not precluded by the economic loss rule.  Here, neither the ICA nor Amendment governs the use of ELI's customer list.  The UTSA creates a duty on the part of Mr. Kunze, independent of his duties under the ICA and Amendment.  And, further, although a violation of the duty under the UTSA results in some of the same – not all – damages,

---

[29] This aspect of the UTSA claim was not directed at Mr. Kunze, Jr.

[30] $10,500.00 (sales made in April 2011) x 0.29 (1.00 - 0.71 [cost of equipment (FOF 84(b)] = $3,045.00.

[31] The Court makes a distinction between the two amounts, not because one amount arises from a breach of contract. Instead, the Court does so to avoid a duplication of an award of damages, where the damages are also sustained from a breach of an independent duty arising under the UTSA, when it makes its final damages award.

In addition, Mr. Kunze cannot have it both ways, arguing, on the one hand, the ICA does not cover equipment sales and arguing, on the other hand, that the economic loss rule bars the UTSA claim because ELI has a contractual remedy.

it is because of the nature of the use by Mr. Kunze of the trade secrets, not because the UTSA

claim is a breach of contract claim in disguise. Accordingly, the Court finds in favor of ELI on

this claim and awards $174,294.00 in damages ($87,147.00 (actual) + $87,147.00 (punitive)).

### 3. ELI's Claims Under the Lanham Act

#### a) The Economic Loss Rule is no Bar

Mr. Kunze asserts liability under the Lanham Act is precluded based on the economic

loss rule; the Court finds otherwise.

In evaluating whether the economic loss rule applies to ELI's Lanham Act claims, only

the ICA and Amendment need be considered. The PSA's provisions concerning "trade secrets"

and otherwise are inapplicable for a number of reasons, including the fact that ELI is not a party

to that agreement. Starting with the ICA, the Court finds ELI's claims do not arise from any

contractual duty owed by Mr. Kunze. Section 3.2, covering "quality assurance" and "quality

control," applies to Mr. Kunze's actions taken while acting on behalf of RMLC, not while acting

otherwise. As for the Amendment, Section 3(a) allows Mr. Kunze to provide independent

training and use the ELI's approved curriculum and to issue a certificate of completion, but those

are not the bases for ELI's Lanham Act claims. Further, the relief sought is not only lost profits

but also statutory damages and injunctive relief specifically afforded under the Lanham Act.

Thus, the duty complained of is not a contractual one arising from the agreements.

Moreover, even assuming, *arguendo*, the Lanham Act claims are within the scope of the

ICA and Amendment, the Court finds Congress enacted specific statutory rights and remedies

which exist independent of a breach of contract claim. In light of the Lanham Act's

comprehensive statutory federal scheme, the Court finds that a litigant's ability to pursue rights

and remedies under the Lanham Act is not dependent on the scope of a state-adopted rule, the

application of which varies from state to state.  *Cf. Nero v. Am. Fam. Mut. Ins. Co.*, 2013 WL

5323147, at *6 (CCPA claim barred by economic loss rule) *with KDH Elect. Systems, Inc. v.*

*Curtis Tech. Ltd.*, 826 F. Supp. 2d 782, 802 (E.D. Pa. 2011) (declining to apply the economic

loss rule to preclude statutory claims; therefore, finding Pennsylvania Uniform Trade Secrets Act

not precluded).  Accordingly, ELI's claims are not barred.

### b)  Unfair Competition and False Designation of Origin under 15 U.S.C. § 1125(a)(1)(A) – ELI's First Claim against Mr.  Kunze

Section 1125(a)(1)(A) provides that:

> [a]ny person who, on or in connection with any goods or services,…uses in
> commerce any word, term, name, symbol, or device, or any combination thereof,
> or any false designation of origin, false or misleading description of fact, or false
> or misleading representation of fact, which - - (A) is likely to cause confusion, or
> to cause a mistake, or to deceive as to the affiliation, connection, or association of
> such person with another person, or as to the origin, sponsorship, or approval of
> his or her goods, services, or commercial activities by another person…shall be
> liable in a civil action by any person who believes that he or she is or is likely to
> be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).   Under the facts and circumstances of this case, Mr. Kunze's actions

in using ROCKY MOUNTAIN LASER COLLEGE and RMLC in connection with offering and

providing laser education – in competition with ELI – violated § 1125(a)(1)(A), but his actions in

using Certified Laser Specialist and CLS did not.

"Section 43(a) of the Lanham Act, prohibiting the use of false designations of origin,

protects against service mark infringement even if the mark has not been federally registered."

*Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1215 (10th Cir. 2004) (quotation marks and

citation omitted).   In order to prevail on an action under § 43(a), a plaintiff must establish (1) the

mark is protectable; and (2) "the defendant's use of an identical or similar mark is likely to cause

confusion among consumers." *Id.* at 1215 (brackets, quotation marks, and citation omitted).  "To

be protectable, a mark must be capable of distinguishing the products or services it marks from those of others." *Id.* at 1216 (brackets, quotation marks, and citation omitted).

There are five categories of terms with respect to the protection of a mark: generic, descriptive, suggestive, arbitrary, and fanciful. *Id.* at 1216. "A mark is descriptive if it describes the product's or service's features, qualities, or ingredients in ordinary language or describes the use to which the product or service is put." *Id.* (quoting *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999)) (brackets omitted). "A descriptive mark may be eligible for protection, but only if it has acquired a secondary meaning in the minds of the public." *Id.* at 1216 (quotation marks and citation omitted); *see Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 940 (10th Cir. 1983) (trademark that is descriptive may only be registered if it has acquired a secondary meaning). "Secondary meaning exists only if most consumers have come to think of the word as not descriptive at all but as the name of the product or service." *Donchez,* 392 F.3d. at 1218 (brackets, quotation marks, and citation omitted). It is not the fact-finder's perception of the mark that is at issue but, rather, that of the purchasing public. *Id.* at 1216.

A plaintiff may establish secondary meaning of its mark through the use of direct evidence, such as consumer surveys and consumers' testimony. *Id.* at 1218. Secondary meaning may also be established though circumstantial evidence regarding: (1) the length and manner of its use; (2) the nature and extent of advertising and promotion of the mark; and (3) the efforts made to promote a conscious connection, in the public's mind, between the mark and a particular product or service. *Id.*

ELI's marks, ROCKY MOUNTAIN LASER COLLEGE and RMLC, are protectable and Mr. Kunze's use caused confusion among consumers. First, the marks have developed a

secondary meaning for laser education services.  That is shown by evidence from students, a competitor (Rock Creek), and laser manufacturers.  That is also shown by circumstantial evidence, *i.e.,* the marks have been used for many years to identify ELI, advertised on multiple websites and on ELI's materials, and consistently associated with ELI to distinguish its services from those offered by other laser education facilities.  Next, Mr. Kunze's use of the identical marks, and especially when used interchangeably with American Laser College or ALC, caused confusion among the consumers.  Students believed they were taking a ROCKY MOUNTAIN LASER COLLEGE course, and that ROCKY MOUNTAIN LASER COLLEGE and ALC were the same.  Indeed, Mr. Kunze intentionally passed off ROCKY MOUNTAIN LASER COLLEGE – and its laser education materials – as his own.  Accordingly, Mr. Kunze is liable under §43(a) for his use of ROCKY MOUNTAIN LASER COLLEGE and RMLC.

The Certified Laser Specialist and CLS, however, are not protectable marks based on the record before the Court.  Any evidence that Certified Laser Specialist is associated with ELI (or RMLC) is *de minimis* and insufficient to support a finding that it has acquired a secondary meaning, especially in light of its use by others of similar, if not identical, marks.[32]  "'Use by others of a similar mark will tend to dilute any consumer recognition and association of that mark with the alleged owner.  Such use by third parties is therefore relevant to the issue of secondary meaning.'"  *Vail Assocs., Inc. v. Vend-Tel-Co., Ltd.*, 516 F.3d 853, 867 (10th Cir. 2008) (quoting Thomas J. McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 15:27, at 15–41 (4th ed. 2007)).   Accordingly, no violation has been shown as to these marks.[33]

---

[32] *See* FOF 40.

[33] On this record, the Court does not give any weight to the fact that Certified Laser Specialist is registered as a service mark on the Supplemental Register, and not the Principal Register.

### c)  ELI's Claim for False Advertising against Kunze (Claim Two)

In order to succeed on its false advertising claim under 15 U.S.C. § 1125(a)(1)(B), ELI

must show:

(1) defendant made false or misleading representations of fact in connection with the commercial or promotion of its product or services;
(2) in commerce;
(3) the misrepresentations are material, *i.e.,* likely to influence the purchasing decision;
(4) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product or services with or by another; or (b) the characteristics of the goods or services; and
(3) injured plaintiff.

*See World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1140 (10th Cir. 2006)

(quoting *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 980 (10th Cir. 2002)); *Zoller*

*Labs., LLC v. NBTY, Inc.*, 111 F. App'x 978, 982 (10th Cir. 2004) (unpublished).[34]  To qualify as

a false or misleading statement, a plaintiff must show defendant's statement was either (1)

literally false, either on its face or by necessary implication, or (2) literally true or ambiguous,

but implicitly false, misleading in context, or likely to deceive.  *See Zoller Labs.,* 111 F. App'x at

982; *General Steel Domestic Sales, LLC v. Chumley*, 627 F. App'x 682, 2015 WL 4591924, at

*2 (10th Cir. 2015) (unpublished).

To prevail on an implied falsity claim, a plaintiff must show "'actual consumer

deception.'" *Vincent v. Utah Plastic Surgery Soc.*, 621 F. App'x 546, 550 (10th Cir. 2015)

(unpublished) (quoting *Abbott Labs v. Mead Johnson & Co.*, 971 F.2d 6, 14 (7th Cir. 1992)).  A

plaintiff may make this showing with evidence "that demonstrates 'a statistically significant part

---

[34] In *General Steel Domestic Sales, LLC v. Chumley*, 627 F. App'x 682, 2015 WL 4591924, at *3 (10th Cir. 2015) (unpublished), the Tenth Circuit stated it has not yet decided whether there is a materiality inquiry to the false or misleading advertisement.  In *Cottrell, Ltd. v. Biotrol Intern., Inc.,* 191 F.3d 1248, 1252, 1256 (10th Cir. 1999), however, the Tenth Circuit cited to and analyzed the Lanham Act claim with such a requirement.  As the parties have not argued otherwise, the Court assumes, without deciding, that such is required.   Nonetheless, even in the absence of such a requirement, the Court finds ELI would not prevail on the other bases claimed.  For example, ELI's claimed damages do not arise from all of such advertisement.  ELI has not claimed – and, even if it did, it has not shown – that Mr. Kunze's fallacious advertisement concerning his pedigree caused ELI any damages.

of the commercial audience holds the false belief allegedly communicated by the challenged advertisement.'" *Vincent*, 621 F. App'x at 550 (quoting *Johnson & Johnson Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297–98, 298 (2d Cir.1992)); *see Zoller Labs.*, 111 F. App'x at 982.

With literal falsity, however, a plaintiff need not present evidence of consumer deception. *Zoller Labs.*, 111 F. App'x at 982.  Similarly, where a plaintiff demonstrates the defendant intended to deceive customers, there is a presumption of consumer confusion which relieves a plaintiff of any obligation to present evidence of likely confusion.  *Netquote, Inc. v. Byrd*, No. 07-cv-00630-DME-MEH, 2008 WL 5225880, at *3 (D. Colo. Dec. 15, 2008).  "Whether an advertisement is literally false is an issue of fact." *Zoller Labs.,* 111 F. App'x at 983 (quotation marks and citation omitted).

In his advertising, in commerce, Mr. Kunze – intentionally and willfully – made numerous false and/or misleading statements concerning the nature, characteristics, or qualities of his goods and services.  Such statements included his credentials to support his skills/abilities to perform laser education services (some false, others misleading); his affiliation with ROCKY MOUNTAIN LASER COLLEGE and ability to issue CERTIFIED LASER SPECIALIST certificates (false); that ROCKY MOUNTAIN LASER COLLEGE and American Laser College are affiliated or the same (false); and that CERTIFIED LASER SPECIALIST is a registered trademark (false).  Thus, the first and second elements are satisfied.

Materiality, however, is a different issue.  The Court finds the misrepresentations concerning Mr. Kunze's affiliation with ROCKY MOUNTAIN LASER COLLEGE material, but – as to the remaining misrepresentations – insufficient evidence has been shown to support such a finding.  For example, from the limited evidence presented, while the evidence supports that

receiving *some* certification was important to the consumers, for many consumers it mattered not whether it was a CLS or a CLT.

The Court finds the misrepresentations as to affiliation with ROCKY MOUNTAIN LASER COLLEGE are literally false; therefore, ELI need not present evidence of consumer confusion.  Moreover, such evidence need not be presented as the Court finds them to be intentional.[35]

Finally, ELI has been damaged from Mr. Kunze's false advertising concerning his and American Laser College's affiliation with ROCKY MOUNTAIN LASER COLLEGE.  Students signed up for Mr. Kunze's courses believing they were taking a ROCKY MOUNTAIN LASER COLLEGE course and would be receiving ROCKY MOUNTAIN LASER COLLEGE certificates, but they did not.[36]  Mr. Kunze's actions injured not only ELI's sales but also its reputation.  The Court finds in favor of ELI on this claim, on this basis.

### d)  Relief

**Damages and Lost Profits.**  As relief for violation of § 1125(a), ELI may be entitled to recover (1) Mr. Kunze's profits, (2) any damages, and (3) the costs of the action.  "An accounting of profits is not automatically granted upon a showing of infringement," *Western Diversified. Servs., Inc. v. Hyundai Motor America, Inc.*, 427 F.3d 1269, 1273 (10th Cir. 2005), and ELI never claimed any entitlement to disgorgement of Mr. Kunze's profits received from teaching laser education courses.  That leaves the issue of damages.[37]

As for damages, ELI relies on Mr. Cadorette's report of general lost profits as its damages, and seeks to have them trebled.  As previously discussed, however, Mr. Cadorette's

---

[35] Even so, the Court finds evidence has been presented showing consumer confusion and deception.

[36] In addition, in light of Mr. Kunze's willful deception, there is authority for the proposition that injury may be presumed in such instance.  *See General Steel*, 2015 WL 4591924, at *4; *Hutchinson v. Pfeil*, 211 F.3d 515, 522 (10th Cir. 2000).

[37] ELI did not request costs under the Lanham Act.

report is not a reliable measurement of the total lost profits sustained.  Moreover, ELI has not shown that loss from equipment sales resulted from a violation of the Lanham Act.  Nonetheless, ELI has shown damages in the form of harm to its goodwill and reputation.  In addition, ELI has shown damages in the form of lost class revenues in the amount of $41,731.00 ($2,456.00 [Houston, Texas] + $200.00 [10% x $2,000.00 (April 18, 2011 class)] + $1,575.00 [10% x $15,750.00 (Bellevue, Washington)] + $37,500.00 [Rock Creek]).  Again, the Court will account for any duplicative damages in its determination of total damages to be awarded.

The Court's assessment of damages is "subject to the principles of equity," and the trebling of damages may be made "according to the circumstances of the case."  15 U.S.C. § 1117.  In "weighing the equities" of the case, the Court finds that trebling of actual damages is appropriate.  Here, ELI lost class revenues and commissions, the extent of its damages are difficult to ascertain, Mr. Kunze benefitted from ELI's goodwill and reputation, and Mr. Kunze's actions were willful, *i.e.,* Mr. Kunze intended to benefit from the goodwill and reputation of ROCKY MOUNTAIN LASER COLLEGE, owned by ELI.  Under the circumstances of this case, the Court finds that awarding treble damages of the actual damages is not precluded by the Act.  *See Western Diversified, supra* at 1273 (recognizing a court has discretion to reduce or eliminate a profit award in fashioning an equitable remedy to meet the needs of each case); *Klein-Becker, supra* (same).  Accordingly, ELI is awarded $125,193.00 (3 x $41,731.00).

**Injunctive Relief.**  There are no other damages claimed, but injunctive relief is sought.  Pursuant to 15 U.S.C. § 1116, the court may grant injunctive relief in accordance with "the principles of equity and upon such terms as the court may deem reasonable."  The Court finds ELI is entitled to injunctive relief, as discussed below.

**Attorney's Fees.**  In the court's discretion, attorney's fees may be awarded to the prevailing party in "exceptional" cases.  15 U.S.C. § 1117(a).  "An 'exceptional case' is one in which the trademark infringement is 'malicious, fraudulent, deliberate, or willful.'"  *Western Diversified*, 427 F.3d at 1273 (citation omitted); *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1232 (10th Cir. 2000).  The Court finds this is one of those "exceptional cases" where an award of attorney's fees against Mr. Kunze is warranted.  Here, Mr. Kunze intentionally used ELI's marks for his own benefit when he taught students using ROCKY MOUNTAIN LASER COLLEGE, and he continued to use the marks even after the Amendment was terminated and ELI requested Mr. Kunze to stop doing so.  Mr. Kunze offered no credible explanation as to why he was entitled to do so.  *See United Phosphorus, supra.*  Accordingly, ELI is awarded its reasonable attorney's fees incurred on the Lanham Act claims.

**Prejudgment Interest.**  ELI requests an award of prejudgment interest to run from May 2, 2011, the date in which it terminated the Amendment for cause, and Mr. Kunze no longer had any right to use ELI's ROCKY MOUNTAIN LASER COLLEGE or RMLC marks for any reason.  In evaluating ELI's request, the Court focuses on a two-step analysis: (1) whether an award of prejudgment interest would serve to compensate the plaintiff; and (2) whether equity precludes an award.  *United Phosphorus,* 205 F.3d at 1237.  In the federal context, there is "a preference, if not presumption, for prejudgment interest."  *Id.* at 1236.  Whether to award prejudgment interest is within the sound discretion of the trial court.  *See Caldwell v. Life Ins. Co. of N. Amer.*, 287 F.3d 1276, 1287 (10th Cir. 2002).

In the exercise of its discretion, the Court finds that an award of prejudgment interest is appropriate.  In this case, the prejudgment interest would serve to compensate ELI for its loss, especially in light of the prolonged proceedings, caused in part by Mr. Kunze's bankruptcy,

which preceded the resolution of these claims in ELI's favor.  There is no evidence that equity

would preclude the award of prejudgment interest in this case.  On the contrary, the award would

serve to make ELI whole.  *Caldwell,* 287 F.3d at 1286 ("[P]rejudgment interest is generally

available to compensate the wronged party for being deprived of the monetary value of his loss

from the time of the loss to the payment of the judgment.") (quotation marks and citation

omitted).  Accordingly, the Court awards ELI prejudgment interest to run from May 2, 201l, the

date ELI requested.[38]

The calculation of prejudgment interest is also within the district court's sound discretion.

*Caldwell*, 287 F.3d at 1287-88; *Kleier Ad., Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036, 1042

n.4 (10th Cir. 1990).   ELI requests interest at the "statutory rate" but did not identify which

statutory rate it seeks, or the basis therefore, as to its Lanham Act claims.  For other claims, ELI

seeks interest pursuant to C.R.S. § 5-12-102(b) at the statutory rate of eight percent (8%) per

annum for money/property wrongfully withheld or, in the alternative, "prejudgment interest"

under 28 U.S.C. § 1961, the post-judgment interest statute.  The Court finds the post-judgment

interest rate under § 1961 would reasonably compensate ELI for the loss of use of money for the

applicable time period.  Accordingly, prejudgment interest at the rate of 0.68 % per annum shall

run from May 2, 2011 to the date of this Order.

### 4.  Civil Theft[39] – ELI's Sixth Claim against Defendants

Mr. Kunze is liable for civil theft but Mr. Kunze, Jr. is not.  Civil theft is established

where (1) defendant knowingly obtained control over plaintiff's property without authorization,

or by threat or deception; and (2) with the specific intent to permanently deprive plaintiff of the

---

[38] ECF No. 226, page 42, ¶ L.

[39] ELI calls its claim conversion/civil theft but common-law conversion is a distinct claim from civil theft.  *See Itin,* 17 P.3d at 135 n.10.  Conversion is "'any distinct, unauthorized act of dominion or ownership exercised by one person over personal property belonging to another.'"  *Id.* (quoting *Byron v. York Inv. Co.,* 133 Colo. 418, 424, 296 P.2d 742, 745 (1956)).  Based on the arguments and evidence presented for trial, the Court finds ELI abandoned its claim for conversion and proceeded solely under the civil theft statute.

benefit of the property.  *See West v. Roberts*, 143 P.3d 1037, 1040 (Colo. 2006*); Itin v. Ungar*, 17

P.3d 129, 134 (Colo. 2000); *Huffman v. Westmoreland Coal Co.,* 205 P.3d 501, 509 (Colo. App.

2009); C.R.S. § 18-4-401(1)(a).  The requisite intent may be inferred from the defendant's

conduct and the circumstances of the case, but requires proof of defendant's knowing use of the

property inconsistent with the plaintiff's permanent use and benefit.  *Huffman*, 205 P.3d at 509.

The return of the stolen property does not necessarily defeat the claim.  *People v. American*

*Health Care, Inc.*, 42 Colo. App. 209, 211, 591 P.2d 1343, 1345 (1979) (return of the property

does not necessarily negate the existence of a wrongful intent); *Ziegler v. Inabata of Amer., Inc.*,

316 F. Supp. 2d 908, 916 (D. Colo. 2004).  And, "where initial control of the property is

authorized, 'the intent to deprive . . . may arise at a later time when control is no longer

authorized.'"  *American Health*, 591 P.2d at 1345 (citation omitted, ellipses in original).

Mr. Kunze is liable for civil theft of the two THERMO-Los which are ELI's property.

They cost ELI $875.00 each.  Mr. Kunze is also liable for civil theft of the two MediDerms

valued at $15,000.00 each as, although on loan, ELI had the right to – and has been deprived of –

the use and possession of the MediDerms.  Further, it is ELI who would be responsible to the

title owner for any loss or damage to this equipment.  *See* C.R.S. § 18-4-401(1) ("A person

commits theft when he or she knowingly obtains, retains, or exercises control over anything of

value *of another* without authorization or by threat or deception…..") (emphasis supplied); *see*

*Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1186, 1195-6 (Colo. App. 2008) (lender, with security

interest in the proceeds of the collateral used to secure lender's loan, had an ownership interest in

such proceeds sufficient to support its claim for civil theft); *McFeters v. Pierson*, 15 Colo. 201,

203 (1890) ("'[O]wner,' when used alone, imports an absolute owner…; but the meaning of a

word is often varied according to the connection in which it is used, and is to be understood

accordin[g] to the subject-matter to which it relates."). As the immediate prior owner of ELI, Mr. Kunze knew the equipment was ELI's property. Any possession or control of the THERMO-Los authorized was revoked when replacement THERMO-Los promised were not provided. And, Mr. Kunze returned the MediDerms, but in nonworking conditions, and only after ELI demanded their return.

As for the Pro-scope microscope camera, the evidence is insufficient to show civil theft by Mr. Kunze of this equipment.

Finally, as to Mr. Kunze, Jr., although pled in the Amended Complaint, based on the evidence and arguments, the Court finds this claim is abandoned as to Mr. Kunze, Jr.

In summary, Mr. Kunze is liable to ELI for civil theft. Such claim is not barred by the economic loss rule. Unlike *Rees, supra,* and *Makoto, supra,* ELI's civil theft claim does not arise from any contractual duty under the ICA or Amendment, and is in no way dependent on a finding that there was a breach of such agreements. Accordingly, Mr. Kunze is liable to ELI for $95,250.00,[40] three times the amount of the actual damages sustained. In addition, as addressed below, ELI is awarded its costs and reasonable attorney fees. C.R.S. § 18-4-405 ("[T]he owner may recover two hundred dollars or three times the amount of the actual damages sustained by him, whichever is greater, and may also recover costs of the action and reasonable attorney fees….")

### 5. ELI's Claim for Violation of the Colorado Consumer Protection Act (Eighth Claim)

ELI's CCPA claim is based on the same facts which support its claim for unfair competition (*i.e.,* using ELI's marks), false advertising (*e.g.,* Mr. Kunze's misrepresentation of his credentials, that his services were approved by the DPOS, and that he was still affiliated with

---

[40] 3 x $31,750.00 ($30,000.00 [MediDerms = 2 x $15,000.00]) + $1,750.00 [THERMO-Los = 2 x $875.00]).

ELI), and defamation.  Some, but not all of such facts, support a finding of a violation of the CCPA, for which the economic loss rule is no bar.

In order to recover on a CCPA claim, ELI must show: (1) Mr. Kunze engaged in a deceptive trade practice; (2) the practice occurred in the course of Mr. Kunze's business; (3) the practice significantly impacted the public as actual or potential consumers of Mr. Kunze's services; (4) ELI was an actual or potential consumer of Mr. Kunze's services or was injured in the course of its business as a result of the deceptive trade practice; and (5) the practice caused actual damages or losses to ELI.  CJI-Civ. 29:1 (2015); *Hall v. Walter*, 969 P.2d 224, 234-5 (Colo. 1998).  Actionable deceptive trade practices include: (1) knowingly passing off services as those of another; (2) knowingly making a false representation as to the source, sponsorship, approval, or certification of services; (3) knowingly making a false representation as to affiliation, connection, or association with or certification by another; and (4) knowingly making a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith.  C.R.S. § 6-1-105(1)(a)-(c) & (e).

To evaluate the public impact requirement, relevant considerations include: "(1) the number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future." *Rhino Linings USA, Inc. v. Rocky Mtn Rhino Lining, Inc.,* 62 P.3d 142, 149 (Colo. 2003).  A breach of contract claim – which arises when one contracting party breaks a promise – without more, is not an actionable claim under the CCPA.  *Id.* at 148.  A purely private wrong is also not actionable.  *Id.* at 149; *see Martinez v. Lewis*, 969 P.2d 213, 222 (Colo. 1998).

In this case, Mr. Kunze's action in making defamatory statements about ELI is not a deceptive trade practice.  Moreover, it is purely a private wrong.  As such, it is not actionable as violation of the CCPA.

As for Mr. Kunze's other actions, the Colorado Supreme Court has recognized that widespread advertisement directed to the market generally which implicates the public as consumers can satisfy the "significant public impact" requirement. *Hall v. Walter*, 969 P.2d at 235.  In light of the length of time and the number of websites on which Mr. Kunze posted the false and misleading advertisement on the internet, a significant number of consumers would have been affected by his actions.

As for the relative sophistication and bargaining power of the consumers affected, what little evidence that was presented shows varying degrees of sophistication.  Mr. Jellerich showed some sophistication as he knew to check whether the certification he would be receiving from Mr. Kunze's course was in fact required.  Others did not.  On the whole, the Court finds that students are likely to be unsophisticated consumers with bargaining weaknesses.

Some of the challenged practice previously impacted other consumers, as shown by students who enrolled believing they would be taking a ROCKY MOUNTAIN LASER COLLEGE course and that ROCKY MOUNTAIN LASER COLLEGE was the same as or affiliated with American Laser College.  And, this will continue if Mr. Kunze is allowed to carry on such practices.  As for Mr. Kunze's false advertisements concerning his affiliations with other organizations, his credentials, and the like, however, insufficient evidence was presented that this practice impacted any consumers.   In summary, in consideration of the relevant guidelines, the Court finds the required showing of a significant public impact has been made, but only as to Mr. Kunze's false representations – knowingly made – in passing off his services as those of

ROCKY MOUNTAIN LASER COLLEGE, and in representing he and his course were sponsored by, connected with, or affiliated with ROCKY MOUNTAIN LASER COLLEGE.

Finally, the Court finds Mr. Kunze's actions caused ELI damages.  Here, for example, the students took the course directly from Mr. Kunze, believing they were taking a ROCKY MOUNTAIN LASER COLLEGE course.  Accordingly, damages in the amount of $41,731.00 have been shown.[41]   As the Court finds, by clear and convincing evidence, that Mr. Kunze engaged in bad faith conduct, these damages are trebled to $124,293.00.   C.R.S. § 6-1-113(2) & (2.3).  In addition, the Court awards ELI attorney's fees and costs.  C.R.S. § 6-1-113(2)(b).

Contrary to Mr. Kunze's argument, this claim is not barred by the CCPA.  Here, the duty to refrain from misusing ROCKY MOUNTAIN LASER COLLEGE arises independent of any contractual duty – it is independent of any duty not to compete.  Accordingly, the Court finds in favor of ELI on this claim.

### 6.   Defamation and Libel Per Se – ELI's Seventh Claim and Mr. Fluken's Third Counterclaim, respectively, against Mr. Kunze

Mr. Kunze concedes the statements he published would be defamatory *per se* but for the fact that they are true and he was relying on ELI's medical director's opinion.  Mr. Kunze's arguments are not supported by the evidence.  The statements concerning ELI and Mr. Fluken were not true, and the medical director never made the statement to which Mr. Kunze attributes to him.  Accordingly, Mr. Kunze's statements to ELI's landlord, Mr. Fluken's banker, ELI's laser supplier (Cynosure), and ELI's students (*e.g.*, Ms. Livermore) are defamatory *per se*.  *E.g., Pagosa Hot Spring, Inc. v. Arnold*, 493 P.2d 383, 385 (Colo. App. 1972) ("It is libel per se to make false statements attacking a merchant's credit or imputing insolvency, financial difficulties or embarrassment.); *Gordon v. Boyles,* 99 P.3d 75, 79 (Colo. App. 2004) ("The traditional

---

[41] *See* n. 41, *infra.*

categories of slander per se are imputation of…(3) a matter incompatible with the individual's business, trade, profession, or office….").

Damages will be awarded, despite Mr. Kunze's contention that Mr. Fluken and ELI have not been damaged.  Where the plaintiff is a private person, and a statement is defamatory *per se*, damage is presumed and the plaintiff need not plead special damages or prove actual damages. *Denver Pub. Co. v. Bueno* , 54 P.3d 893, 900 (Colo. 2002); *Han Ye Lee v. Colo. Times, Inc.*, 222 P.3d 957, 961 (Colo. App. 2009).  General damages are recoverable as a matter of course and require no evidence.  *Pagosa Hot Spring, Inc.*, 493 P.2d at 386.  The Court finds Mr. Kunze's publications of the untrue statements concerning ELI and Mr. Fluken were a part of his efforts to compete against and to damage ELI and Mr. Fluken, so that Mr. Kunze could continue to be "Mr. Laser Man."  The Court awards Mr. Fluken and ELI each $25,000.00, for a total of $50,000.00.

### 7.  Injunctive Relief

ELI requests injunctive relief based on its claims for violations under the Lanham Act (Claims One and Two); for violation of the UTSA (Claim Three); and for declaratory relief that the Amendment is void (Claim Four).  The Court finds that a permanent injunction should issue on Claims One, Two, and Three, but not on Claim Four.

In order to grant injunctive relief, a plaintiff must show: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest."  *See Klein-Becker USA, LLC v. Englert*, 711 F.3d 1153, 1164 (10th Cir. 2013) (quoting with approval the factors used by the district court) (internal quotation marks and citation omitted).

As discussed above, ELI has established success on the merits of its Lanham Act and UTSA claims.  ELI will suffer irreparable harm to the goodwill and reputation of ROCKY MOUNTAIN LASER COLLEGE if Mr. Kunze is not enjoined from using or referring to ROCKY MOUNTAIN LASER COLLEGE or RMLC in marketing his goods and services, as evidenced by Mr. Kunze's use of such marks to draw students to enroll only to then award them certificates from another facility.  In addition, ELI will suffer irreparable harm if Mr. Kunze is allowed to continue to use ELI's customer list in order to solicit clients and sell laser equipment. Such sales erode ELI's customer base and damages will be difficult to determine due to ELI's inability to monitor Mr. Kunze's sales.  *See Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1263-64 (10th Cir. 2004) (factors supporting irreparable harm include the inability or difficulty in calculating damages, loss of a unique product, and existence of intangible harms such as loss of goodwill or competitive market position); *Walgreen Co. v. Sara Creek Prop. Co.*, 775 F. Supp. 1192, 1197 (E.D. Wis. 1991) (irreparable harm may be found where plaintiff could not be compensated in money damages for its loss of goodwill, including erosion of customer base and diminution of corporate image), *cited with approval in Dominion, supra* at 1264.  The Court recognizes that ELI presented insufficient evidence of continuing sales to support an award of damages subsequent to the termination of the parties' relationship, but it is this very difficulty in discovering Mr. Kunze's use (and resulting damages) that supports the issuance of injunctive relief.  *See Southwest Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009) (irreparable harm may be shown where the evidence suggests that it is impossible to precisely calculate the amount of damages a plaintiff will suffer); *Dominion, supra* at 1264-1265.

Third, the threatened injury to ELI outweighs any harm which may cause Mr. Kunze. The Court finds no legal injury would occur in precluding Mr. Kunze's use of ROCKY MOUNTAIN LASER COLLEGE or RMLC, and use of ELI's customer list, as the right to use these marks and list belongs to ELI.  Mr. Kunze sold any "right" (as owner, officer, or otherwise) to their use when he sold ELI.  Mr. Kunze is not precluded from teaching laser education courses or selling laser equipment; he is simply being precluded from doing so unfairly, through the use of marks and trade secrets belonging to ELI.

Finally, the issuance of the injunction would not adversely affect the public interest. Instead, the injunction would promote the public interest as they would otherwise be misled by Mr. Kunze's unauthorized use of such marks.  In addition, the public has an interest in protecting valid trade secrets and preventing unfair competition.

In addition to precluding Mr. Kunze from using ELI's marks, Section 1116 of the Lanham Act provides that the injunction may include a directive that defendant file a written affidavit detailing the manner and form in which a defendant has complied with the injunction. Under the facts and circumstances of this case, the Court finds such a directive to be appropriate, under not only the Lanham Act but also the UTSA.

## III.   ORDER

Based on the foregoing, the Court **FINDS** and **ORDERS** as follows:

### A.   **On Plaintiff Electrology Laboratory, Inc.'s Claims for Relief:**

(1)   On Plaintiff's First and Second Claims for Relief under the Lanham Act against Defendant Kunze, the Court finds in favor of Plaintiff and against Defendant Kunze and awards Plaintiff the following:

(i) $125,193.00, with prejudgment interest to run at the rate of 0.68%;

(ii) attorney's fees; and

(iii) Injunctive relief, as set forth below;

(2)      On Plaintiff's Third Claim for Relief for Misappropriation of Trade Secrets

against Defendant Kunze and Defendant Larry Paul Kunze, Jr. a/k/a Lorenzo

Kunze, Jr. ("Defendant Kunze, Jr."):

(i)  The Court finds in favor of Defendants Kunze and Kunze, Jr. on the claim for

misappropriation of Plaintiff's curriculum;

(ii) The Court finds in favor of Plaintiff and against Defendant Kunze for

misappropriation of Plaintiff's customer list and awards Plaintiff $174,294.00

($87,147.00[42] [damages] and $ 87,147.00 [punitive damages]) and injunctive

relief (as set forth below);

(3)      On Plaintiff's First, Second, and Third Claims for Relief:

That Defendant Kunze and his agents, servants, employees, and attorneys, and

other persons and entities who are in active concert or participation with them, are

**PERMANENTLY ENJOINED** from the following:

(i)  Using Plaintiff's customer list and any information contained therein; and

(ii) Using "ROCKY MOUNTAIN LASER COLLEGE," "Rocky Mountain Laser

College" or "RMLC" in any form and in any medium, other than to identify

that Defendant Kunze formerly taught at, was the former shareholder or owner

of, or received a Certified Laser Specialist or CLS certificate from ROCKY

MOUNTAIN LASER COLLEGE, Rocky Mountain Laser College, or RMLC;

(4)      On Plaintiff's First, Second, and Third Claims for Relief:

That, within thirty (30) days of the date of this Order, Defendant Kunze shall:

---

[42] $84,102.00 (prior to April 4, 2011) + $3,045.00 (on or after April 4, 2011).

(i)  Remove, delete, and destroy all copies of Plaintiff's customer list from all medium, whether in written, electronic, or any other form; and

(ii)  Remove and delete all references to ROCKY MOUNTAIN LASER COLLEGE, Rocky Mountain Laser College, or RMLC from laserlaser.com and all other websites Defendant Kunze (directly or indirectly) owns or controls, his social media sites, his LinkedIn profile(s), business cards, educational materials, and otherwise, other than as expressly permitted in paragraph (3) above;

(5)  On Plaintiff's First, Second, and Third Claims for Relief:

That within thirty (30) days of the date of this Order, Defendant Kunze shall file an affidavit with the Court certifying compliance with paragraphs (3) and (4) above;

(6)  On Plaintiff's Fourth Claim for Relief to Void the Amendment for economic duress against Defendant  Kunze: the Court finds in favor of Defendant Kunze as the Amendment is not void;

(7)  On Plaintiff's Fifth Claim for Relief for Breach of Contract (Independent Contractor Agreement and Amendment) against Defendant Kunze: the Court finds in favor of ELI and orders an award of $127,608.00[43] in damages;

(8)  On Plaintiff's Sixth Claim for Civil Theft against Defendants:

(i)  The Court finds in favor of Defendant Kunze, Jr.; and

(ii)  The Court finds in favor of Plaintiff and against Defendant Kunze, and awards damages in the amount of $95,250.00,[44] and attorney's fees and costs;

---

[43] $84,102.00 (equipment sales) + 2,456.00 (Texas class) + $1,775.00 (April classes) + $1,775.00 (April classes) + $37,500.00 (post-termination classes) = $127,608.00.

(9)     On Plaintiff's Seventh Claim for Defamation against Defendant Kunze: the Court

finds in favor of Plaintiff and against Defendant Kunze, and awards Plaintiff

$25,000.00;

(10)    On Plaintiff's Eighth Claim for Violation of the Colorado Consumer Protection

Act against Defendant Kunze:  the Court finds in favor of Plaintiff and awards

$125,193.00,[45] and attorney's fees and costs;

(11)    That, in order to avoid an award of duplicative damages in favor of Plaintiff, its

award is reduced by $169,339.00 ($84,102.00 [equipment sales] + 85,237.00[46]

[class revenues]);

(12)    That Plaintiff's net award is as follows:

(i)   $125,193.00, with prejudgment interest of 0.68% to run from May 2, 2011 to

the date of this Order; plus

(ii)  $378,006.00 ($672,538.00 [total award] - $169,339.00 [duplicative damages] -

$125,193.00 [amount in (12)(i)]);

(13)    That pursuant to its First, Second, Sixth, and Eighth Claims for Relief, Plaintiff is

awarded its reasonable attorney's fees and shall, within 14 days of the date of this

Order, file a motion for attorney's fees in accordance with Fed. R. Civ. P. 54 and

D.C.COLO.LCivR 54.3; and

(14)    That pursuant to the Sixth and Eighth Claims for Relief, Plaintiff is awarded costs

and shall, within 14 days of the date of this Order, file a bill of costs in

accordance with the procedures under Fed. R. Civ. P. 54(d)(1) and

D.C.COLO.LCivR 54.1, which shall be taxed by the Clerk of the Court.

---

[44]$31,750.00 (actual damages) x 3.
[45] $125,193.00 = 3 x ($2,456.00 + $200.00 + $1,575.00 + $37,500.00 = $41,731.00).
[46] $ 41,731.00  + $41,731.00  + $1,775.00 = $85,237.00.

**B.** **On Defendant Larry Paul Kunze a/k/a Lorenzo Kunze's Counterclaims against Plaintiff Electrology Laboratory, Inc., and Third-Party Claims against Third-Party Defendants Ray Fluken, Jody Riggs Fluken, and Jessica Riggs:**

(1)   On Defendant/Third-Party Plaintiff Kunze's (a) Third Counterclaim for Relief for Breach/Anticipatory Breach of Contract (Promissory Note) against Plaintiff and (b) First Third-Party Claim for Relief for Breach/Anticipatory Breach of Contract (Promissory Note) against Third-Party Defendants:

(i)   The Court finds there was no anticipatory breach of contract;

(ii)   The Court finds in favor of Defendant/Third-Party Plaintiff Kunze for Breach of Contract (Promissory Note) and against Plaintiff and Third-Party Defendants, jointly and severally;

(iii)   Defendant/Third-Party Plaintiff Kunze is awarded $50,000.00 as the principal amount due under the Promissory Note;

(iv)   Defendant/Third-Party Plaintiff Kunze is awarded a 10% late payment fee for each payment that was due which was not timely paid;

(v)   Defendant/Third-Party Plaintiff Kunze is awarded interest at 7% starting on December 23, 2009, on the outstanding balance until paid;

(vi)   That, within fourteen (14) days of the date of this Order, the parties shall confer in good faith to determine an agreed amount due as an award on the Promissory Note;

(vii)   That, if the parties are unable to reach an agreement, within twenty-one (21) days of the date of this Order, they shall file respective status reports setting forth the amount they contend is owed, including all calculations in support of such amount;

(viii)   Defendant/Third-Party Plaintiff Kunze is awarded his attorney's fees and costs in connection with his counterclaim/third-party claim for breach of the Promissory Note, and shall, within 14 days of the date of this Order, file a motion for attorney's fees in accordance with Fed. R. Civ. P. 54 and D.C.COLO.LCivR 54.3; and

(ix)   Defendant/Third-Party Plaintiff Kunze shall, within 14 days of the date of this Order, file a bill of costs in accordance with the procedures under Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1, which shall be taxed by the Clerk of the Court; and

(2)   On Defendant/Third-Party Plaintiff Kunze's (a) Fifth Counterclaim for Relief for Declaratory Relief on the Promissory Note against Plaintiff, and (b) Second Third-Party Claim against Third-Party Defendants, the Court declares as follows:

(i)   That the principal amount due on the Promissory Note was – and is – $50,000.00;

(ii)   That no proration of the incremental earned buyouts is required;

(iii)   That 7% interest began to accrue on December 23, 2009, on the "outstanding balance" and continues until the amount due is paid;

(iv)   That the beginning "outstanding balance" at issue is $50,000.00;

(v)   That the first payment of $35,000.00 in P & I was due by January 1, 2012;

(vi)   That, thereafter, monthly P & I in the amount of $7,719.00 was due starting February 10, 2012, with the full amount due by January 1, 2015;

(vii)   That a 10% late fee is owed to Defendant/Third-Party Plaintiff Kunze for each late payment; and

(viii)   That Plaintiff and Third-Party Defendants breached the Promissory Note.

**C.**     **Third-Party Defendants Ray Fluken, Jody Riggs Fluken, and Jessica Riggs' Third-Party Counterclaims against Third-Party Plaintiff Larry Paul Kunze a/k/a Lorenzo Kunze:**

(1)     On Third-Party Defendants' First Third-Party Counterclaim for Breach of the

Purchase and Sale Agreement against Third-Party Plaintiff: the Court finds in

favor of Third-Party Plaintiff Kunze;

(2)     On Third-Party Defendants' Second Third-Party Counterclaim for Fraudulent

Inducement against Third-Party Plaintiff: the Court finds in favor of Third-Party

Plaintiff Kunze;

(3)     On Third-Party Defendant Ray Fluken's Third Third-Party Counterclaim for libel

per se against Third-Party Plaintiff: the Court finds in favor of Third-Party

Defendant Fluken and awards him $25,000.00; and

**D.**     **Post-Judgment Interest and Judgment**

(1)     That pursuant to 28 U.S.C. § 1961 post-judgment interest shall accrue on the

awards in favor of Plaintiff and Third-Party Defendant/Counterclaimant Ray

Fluken; and

(2)     That the Clerk of the Court shall enter judgment for or against the respective

parties in accordance with this Order.

DATED this 14th day of March, 2016.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge